**UNITED STATES of America,**

v.

**Roger David HANDLEY, et al.**

**No. CR–84–AR–104–NE.**

United States District Court,
N.D. Alabama,
Northeastern Division.

July 27, 1984.

**1258**

Frank W. Donaldson, U.S. Atty., N.D. Ala., Birmingham, Ala., Barbara Kammerman, Craig Shaffer, U.S. Dept. of Justice, Civil Rights Div., Criminal Section, Washington D.C., for the U.S.

Robert P. Bynon, Jr., George C. Lucas, Donald L. Colee, Jr., Sheldon Perhacs, John W. Sudderth, Mark Ellis Martin, Birming-

ham, Ala., Jerry N. Quick, Trussville, Ala., for defendants.

## MEMORANDUM OPINION

ACKER, District Judge.

Seven of the nine defendants in the above entitled cause have moved to suppress as evidence the depositions and other fruits of discovery in *Southern Christian Leadership Conference, etc., et al. v. The Invisible Empire, Knights of the Ku Klux Klan, etc., et al.,* Civil Action No. CV–80–HM–1449–S, formerly entitled *The People's Association of Decatur, et al., v. The Invisible Empire, etc., et al.* The Court has conducted a hearing and has received evidence bearing on the issues raised in the said motions. Pursuant to Rule 12(e), Federal Rules of Criminal Procedure, it is necessary that the Court state findings essential to its decision.

### Findings of Fact

1. A confrontation between black marchers and Ku Klux Klansmen took place in Decatur, Alabama, on May 26, 1979. Several people were injured, including some law enforcement officers.

2. The FBI conducted what appears to have been a thorough investigation of the incident. *Inter alia,* the FBI report shows: (a) that on several occasions, J.R. Brooks, then United States Attorney for the Northern District of Alabama, was "contacted [by the Justice Department] for his opinion relative to the prospective merits of this case"; (b) that on October 26, 1979, the U.S. Attorney's office advised "that after reviewing all of the reports relating to the confrontation of May 26, 1979, between Ku Klux Klansmen and city police officers of Decatur, Alabama, no federal statutes were violated during the course of the incident"; and (c) that the Department of Justice (the Department) shortly thereafter concurred in this decision to "decline prosecution". The file was closed.

3. The fact that the federal investigation had been concluded without any prosecution was soon well known to the general

Alabama population, including both Ku Klux Klansmen and Southern Poverty Law Center (the Center), a law firm in Montgomery, Alabama, which represented a black marcher who had been indicted in the Alabama state court for an alleged offense arising out of the incident of May 26, 1979, and as to which the black marcher was convicted.

4. On November 3, 1980, the Center, as attorneys for a putative class, filed a civil complaint in this Court entitled *The People's Association of Decatur, et al., v. The Invisible Empire, Knights of the Ku Klux Klan, a corporation, and its agents, servants, employees and assigns, et al.*, CV 80–HM–1449–S (the civil suit). Its complaint sought relief in the form of compensatory damages of $500,000.00, plus punitive damages of $500,000.00, against "the defendants jointly and severally". Another prayer strangely but pointedly asked the Court to "refer to the United States Attorney for The Northern District of Alabama, for investigation and possible prosecution, any acts of the defendants which appear to be violations of federal criminal statutes". The lead lawyer for the plaintiffs in the civil case was and is Morris Dees (Dees).

5. Among the defendants in the civil suit were and are Roger David Handley, Ray Winford Steele, David Riccio, David Lee Kelso, Ricky Lynn Creekmore (yet to be served), William Johnny Mason, Lenwood Lewis White, Terry Joe Tucker and Derane O'Neil Godfrey. These nine constitute all of the defendants in this case.

6. After the FBI closed its file, the Center obtained a redacted FBI report on May 22, 1980. In Civil Action No. CV 80–PT–5191–NE, the Center sued in this Court to obtain access to the complete FBI file under the Freedom of Information Act. This Court takes judicial knowledge of the fact that the Department successfully resisted full disclosure by submitting on December 12, 1980, to Hon. Robert B. Propst the affidavit of Hugh James McMenamin, special agent. In his affidavit, McMenamin swore that *"the aforesaid investigation continues to this date."* (emphasis supplied). This does not appear to have been a true statement when it was made. The investigation had been closed on or about October 26, 1979. As of December 22, 1980, the Center had not established any real rapport with the Department, but things would change.

7. The Center, as attorneys for the plaintiffs in the civil suit before Hon. E.B. Haltom, Jr., fully comprehended the fact that most individual Klan members are poor. This knowledge meant, of course, that the Center's seeking of monetary damages was more a threat than a promise. The Center directed both veiled and overt threats toward the civil defendants. The threats consisted not only of exposing defendants to monetary judgments far beyond their means, but to sizable costs for a defense. If the Center was bluffing, its tactics were quite effective. While the Center wielded the "stick" it also offered the "carrot", namely, a dismissal from the civil suit and a recommendation against criminal prosecution if a particular defendant would cooperate and testify. The Center made good on its promise, particularly to civil defendant, Lloyd Letson, who was dismissed from the civil suit in consideration of, and contemporaneously with, his testimony about the Klan conspiracy in which he allegedly participated. He is not a defendant in this case, although he is a named alleged co-conspirator. Although Dees testified by deposition that Letson was represented by counsel at the time of his testimony on October 20, 1982, Dees' recollection is mistaken. Letson was without counsel when he failed to invoke his Fifth Amendment privilege.

8. When Bill Stanton, an investigator for the Center, served papers on defendants and deponents in the civil case, he carried with him an official private investigator's badge which he, from time to time, displayed. At the suppression hearing, where Stanton testified to the effect that Klansmen are impecunious and unsophisticated, he was unable to state whether or not any persons to whom he displayed his badge may have erroneously assumed that he was a law enforcement officer.

9. On October 20, 1982, a hearing took place before Judge Haltom in the civil case. Letson testified. This is the same Letson who is named in the indictment as an unindicted co-conspirator. Henry Frohsin, an Assistant U.S. Attorney, consulted with Dees before the Letson hearing, thereafter obtained a copy of the Letson transcript from Dees, and forwarded it to the Department. The Department did not reopen its investigation until December 7, 1982 (completely contrary to the McMenamin affidavit of December 22, 1980).

10. On February 1, 1983, the Center, filed a motion styled "Motion to Compel Defendants to Answer Certain Questions on Deposition". This motion, *inter alia,* averred:

> The defendants have attempted to frustrate the plaintiffs' efforts to learn the facts surrounding the Klan's violation of their legal rights on May 26, 1979 by initially conspiring to lie to the F.B.I. and other investigative agencies, and then by failing to give full and complete answers to interrogatories propounded by plaintiffs.
>
> \* \* \* \* \* \*
>
> The refusal of the defendants to identify Klanspeople shown in the photographs is a furtherance of the conspiracy against the plaintiffs to conceal the facts surrounding the May 26, 1979 incident.
>
> \* \* \* \* \* \*
>
> Over 40 additional Klansmen remain unidentified, and several who have been identified must be located for service. The defendants' efforts, as described above, are frustrating the orderly trial of this cause. The objections made by the defendants are frivolous.

Among the prayers contained in the said motion was a prayer that the Court order the defendants *"to identify any persons who were in the past or are now Klan members and who are shown in photographs of said Klan activity"*, and a prayer for an order *"requiring the defendants to pay the attorneys' fees and expenses for plaintiffs' counsel for the filing and prosecution of this motion, if plaintiffs' counsel are required to resolve this mo-*

*tion with a hearing before the Court".* (emphasis supplied). This motion was intended to have an intimidating effect, and it had the desired effect.

11. On February 8, 1983, Judge Haltom, without a hearing, entered an order in response to the Center's motion. His order, *inter alia,* contained the following language:

> *The court concludes that a hearing is not necessary....*
>
> \* \* \* \* \* \*

Plaintiffs' motion is in two aspects. First, plaintiffs request that all defendants who are pictured in photographs taken of the scene at Bank and Lee Street, Decatur, Alabama on May 26, 1979 identify themselves and other individuals known to them in said photographs. Plaintiffs are requesting this directive from the court in anticipation of further depositions.

Second, the plaintiffs request that this court order all defendants, who, though not at the scene of any Klan activity but who hold a position of leadership, to identify any persons who were in the past or who now are Klan members and who are shown in photographs of Klan activity.

The court has examined the opinion of the Court of Appeals for the District of Columbia Circuit in *Black Panther Party v. Smith, Attorney General,* 661 F.2d 1243 (D.C.Cir.1981) and finds the conclusions by that court to be persuasive. In accordance with the aforesaid decision, the court first will apply a balancing test. Does the materiality of the information requested outweigh any possible reason a defendant might have to fail to disclose? In this case, the court concludes that the identity of those persons publicly displayed in the photographs of the incident which took place in Decatur, Alabama at Bank and Lee Street on May 26, 1979 is necessary to enable the plaintiffs to present proof of the allegations made in the complaint. *The materiality of this information to the plaintiffs outweighs any claim of privilege to*

*which the defendants may otherwise be entitled.*

In appropriate cases, an organization may be entitled to a privilege either under the First or Fifth Amendments to fail to disclose the identity of its members. With respect to any such members who are known to the public, however, any possible claim of privilege is dissipated. Those individuals who participated in the incident at Decatur, Alabama on May 26, 1979 made their identity known to the public. Therefore, *they are no longer entitled to claim any privilege.*

*It is therefore ORDERED that the individual defendants in this case in responding to questions addressed to them at depositions shall be, and they hereby are, DIRECTED to identify any person appearing in said photographs who is known to them and to state whether any individual so identified is a member of the Invisible Empire, Knights of the Ku Klux Klan.* Any oath which may have been taken by any such individual in the past will not be an excuse for failing to properly respond to a question propounded at a deposition regarding the identity of individuals depicted in said photographs. (emphasis supplied).

Ostensibly, not only did this order of February 8, 1983, suggest the probability of a contempt citation if any defendant should thereafter attempt to exert any privilege (he is "no longer entitled to claim any privilege"), but the more onerous possible sanction of a million dollar default judgment (against which a defendant could not bankrupt) seemed just around the corner to an impecunious, unsophisticated defendant.

12. This Court has already shared with the parties Judge Haltom's independent recollection that on February 8, 1983, he thought that the federal criminal investigation had been finally concluded and the file closed. Whether mistaken in this belief or not, Judge Haltom was acting on the assumption that there was no remaining criminal exposure to the civil defendants in the case pending before him.

13. In truth and in fact, an avowed and a continuing purpose of the Center in its civil action was to obtain a reopening of the criminal investigation and ultimately to obtain a federal indictment of Klansmen.

14. Where there is a charge of criminal conspiracy, the identification by one alleged conspirator of another co-conspirator, in a photograph or otherwise, clearly constitutes two incidents of possible self-incrimination.

15. On February 17, 1983, shortly after it obtained the order of February 8, 1983, the Center took the deposition of defendant Riccio, where the following occurred:

Dees: ... see if you can identify yourself in that photograph?

Willingham [Riccio's attorney at that time]: The answer would be the same for this, that we would plead the 5th Amendment.

Dees: I show you photograph number 64 and ask you if you can identify yourself in that photograph?

Willingham: It would be the same answer.

Dees: ... Judge Haltom has issued an order of the Court directing the deponents in this case to answer questions of: A, identify themselves in any photographs taken at klan activities and; B, identify other people in the same photographs taken at klan activities, whether they are not in those photographs and that counsel for the defendants, including Mr. Riccio at this time, raise the 1st and 5th Amendment grounds by filing an opposition to the Motion To Compel Answers to these questions and then subsequent to that the Judge issued an order and I would like for the record to reflect that we intend to take this matter to the Court and will request payment of immediate attorney's fees and costs for presenting this matter to the Court and in our opinion it is an obstinate failure to follow the Court Order that has been clearly handed down. And I assume Mr. Riccio is aware of the Court Order.

Willingham: I'm not sure. Off the record.

(Off-the-record discussion)

Willingham: We have reviewed the Judge's Order and we will answer the questions. At a point though I understand from the Judge's Order that he is not saying though that any and every question you ask would be excluded from the 5th Amendment so at a point where you ask any questions that would be invasive of his privilege he would have that right but at this point in talking about the pictures we would at least answer those questions.

Dees: All right. Now, are you presently a member of any Ku Klux Klan organization?

(Whereupon, at this time the deponent confers with Willingham.)

Dees: Well, let's go back to the three photographs I showed you. I show you photograph number 64 and ask you to look at that photograph and see if you can identify yourself in that photograph.

Willingham: Of course, I object to the photograph itself. There is no predicate.

Dees: Can you identify yourself in the photograph?

After this colloquy, Riccio understandably caved in and identified himself and others in photographs.

16. After the Riccio deposition, the order of February 8, 1983, became an effective tool by the Center for obtaining information at depositions in the civil suit. The Center not only deposed Riccio, but deposed six other defendants in the instant case, namely, Steele, Godfrey, Handley, White, Mason, and Tucker, some of whom were represented by counsel at the time and some of whom were not. For instance, White had no lawyer when he was deposed. Handley was represented and attempted to raise the Fifth Amendment, but Dees fluffed it off by remarking: "We'll, make a note on that so we can file our motion on that point". Handley then told all about the events of May 26, 1979.

17. No one knows exactly what Judge Haltom would have done if any of the deponents in the civil action had refused to testify, as perhaps they would have been well advised to do. The order, as exploited by Dees, either overrode the Fifth Amendment or lulled deponents into the belief that their Fifth Amendment rights were being preserved.

18. It was not until information generated by the civil suit was furnished to the Department by the Center that the Department decided to reopen its investigation of the incident of May 26, 1979. The Department's investigation would not have been reopened but for the information furnished by the Center.

19. Either before the Department reopened its investigation on December 7, 1982, or shortly thereafter, the Department became fully aware both of the thrust and of the import of the Center's civil suit and of the Center's *modus operandi,* including its use of Judge Haltom's order to obtain potentially self-incriminating responses under oath from prospective federal criminal defendants. Never did the Department place any limitations or reins on the Center nor suggest the possibility that there may be an abuse of civil process or a potential violation of constitutional rights.

20. At the suppression hearing, and in its brief, the Department has vehemently denied that it ever shared any of its information with the Center, and that, in fact, the relationship was a "one way street", or, in other words, that all pertinent information flowed from the Center to the Department and never in the other direction. While this contention in many instances is true, certain evidence clearly reveals a "backflow", or a cooperative effort which involved communications, *initiated by the Department,* including a sharing by the Department with the Center of the Department's case. Here are some examples:

*First*: Stanton testified that the FBI had lost or misplaced its photographs. Stanton could not have known this important fact without its having been revealed to him by the Department. This certainly was a crucial sharing by the Department of information known only to it.

*Second*: The Department requested and set up a meeting which took place at the FBI offices in Birmingham, Alabama, on July 27, 1983, and at which representatives of the Department, the FBI and the Center conferred. Daniel Rinzel, the Deputy Assistant Attorney General of the Civil Rights Division who attended the meeting, recalled the following:

> I told him [Dees] we had reopened the investigation and that *we would be happy to receive any information that he had available to give to us.* (emphasis supplied).

This sounds very much like an open invitation by the Department to the Center to continue the Center's investigation, including the use of its civil action techniques.

*Third:* In response to a question about a later meeting in Rinzel's office in Washington between Dees and Rinzel, and in response to a question as to whether or not Rinzel discussed with Dees any possible prosecution theories, Rinzel testified:

> Well, I am trying to think, Your Honor. I would not be—I don't have a real specific recollection of that. *I would not at all be surprised if we, if there was not some discussion, generally, of federal jurisdiction. That kind of a thing.* (emphasis supplied).

The Court would be surprised if there was not a fairly open discussion of all aspects of the case.

*Fourth:* Dees testified that he recalled no contact between the Center and the Department prior to the meeting of July 27, 1983, except for the request for a FBI report under the Freedom of Information Act and except for the Letson hearing. However, the Center's correspondence files, obtained under subpoena by defendants in the instant case in redacted form, contain, *inter alia,* an important item of correspondence from the Center to the Department *before July 27, 1983.* On June 7, 1983, Dees wrote to Henry Frohsin, Assistant United States Attorney, addressed him "Dear Henry," and said, *inter alia:*

> You mentioned that one of the problems you might have with our witnesses who we have agreed not to pursue as

plaintiffs in exchange for their testimony is the bias a jury might attribute to their statement. This can be countered by the testimony of [redacted].

\* \* \* \* \* \*

> If you think of other ways we can help, let me know. (emphasis supplied).

This letter shows that a copy was sent to Rinzel. The letter indisputably demonstrates that prior to the letter Frohsin had discussed the Government's case, and the shortcomings of the case, with Dees, a fact certainly calculated to encourage Dees to continue, and perhaps to redouble, his investigative efforts. At the suppression hearing the Government objected to Frohsin's being called by defendants as a witness to explain or provide the background for this letter. The Court encouraged the Government to have Frohsin testify, but Frohsin did not do so.

*Fifth:* On April 19, 1984, Stanton sent Rinzel a memo reciting, *inter alia:*

> I understand from Morris' [Dees] conversation with you yesterday that the question of [redacted] whether the federal government has jurisdiction to prosecute the Klan on civil rights violation charges.

This memo clearly reflects that the Department was sharing its problems, concerns and thoughts with the Center before April 19, 1984.

*Sixth:* In Dees' earlier correspondence with Rinzel, his salutation was "Dear Mr. Rinzel". By the time of his letter of April 23, 1984, to Rinzel, shortly before the indictments the salutation read "Dear Dan", indicating a closer relationship. In that letter, Dees began with these words:

> Please excuse me if I *seemed* a bit concerned that a last minute reconsideration by the high officials of the Justice Department might result in no indictments in the Decatur case. (emphasis supplied).

The past tense of the word "seemed" indicates that a previous conversation had taken place between Dees and Rinzel in regard to Department decision making, clearly re-

flecting a sharing of Department thought by Rinzel with Dees. This letter of April 23, 1984, contains remarks which the Court will not here repeat but which no writer would ever write down and mail to an addressee with whom he is not on very close and comfortable terms.

*Seventh:* Stanton admitted that on at least two occasions Craig Shaffer, the line attorney in charge of the instant criminal case under Rinzel, had made unsolicited telephone calls to the Center in Montgomery, Alabama, from Washington, D.C. Thus, the Department was not just a passive recipient of unsolicited information by the Department.

21. After the meeting of July 27, 1983, the Center, being encouraged, took a great many more depositions in its civil case. According to Stanton, the Center's strategy was to get as many potential deponents identified as possible before deposing them and then issuing a large number of deposition subpoenas simultaneously.

22. The Center was well aware of the five year criminal statute of limitations, and the Department was obviously just as aware of it. In fact, shortly before the expiration of the statute, Dees called Rinzel to remind him of the short period of time remaining if indictments were ever to be obtained.

23. After the meeting of July 27, 1983, the Center forwarded a great volume of materials to the Department. These materials included, *inter alia,* depositions, photo packets, individual "profiles", lists of Klansmen at Decatur, summaries, memoranda as to possible federal criminal violations, and statements from witnesses. Some of these things were sent to Shaffer and some to Bill Barnett, Assistant United States Attorney in Birmingham. Stanton always addressed Barnett by his first name.

24. The Government offered no proof of any FBI activity after the investigation was reopened except its obtaining of copies of the civil depositions taken by the Center and its following up by personally interviewing some of the deponents. It is clear then, that the Government's case depends to a very large degree on the Center's work product. The record is devoid of any evidence of the Government's acting "on its own" after its file was closed on October 26, 1979.

25. Rinzel hit the nail on the head in his testimony when he testified as follows:

The Court: You say that what happened in Decatur is what happened in Decatur whether it is civil or criminal?

Rinzel: That is correct, Your Honor.

This testimony simply recognizes the obvious, namely, that the Center's theory of civil conspiracy and the Government's theory of criminal conspiracy are the same.

26. This testimony was quickly followed by the following colloquy:

The Court: Without regard to the motions, pleadings, complaint, [and] the depositions themselves, which the Justice Department came by, however it came by it, there are references in some, at least, to the Fifth Amendment, where counsel for a particular deponent who at that time was a defendant in the civil case and who is now a defendant in the criminal case sought, effectually or ineffectually, to assert the Fifth Amendment rights. Did the Justice Department notice that at any time?

Rinzel: Well, Your Honor, I did not. I didn't read those depositions.

The Court: Well, did anyone else bring that to your attention in the department that there was a Fifth Amendment question brooding out there somewhere?

Rinzel: Not to my recollection, Your Honor.

In other words, although the Department obviously was aware of the use of civil subpoenas by the Center to obtain sworn testimony from prospective criminal defendants, it was blithely unconcerned by any Fifth Amendment or other constitutional implications.

27. At the suppression hearing the Center purported to appear through counsel John Carroll. The Center is not a party in this criminal proceeding and has no stand-

ing except in response to the defendants' subpoena duces tecum. At first the Center asserted a "work product" privilege as to *all* of the information obtained in its investigation of the civil case. Thereafter, the Center rethought its position and waived any such privilege, making the obvious more obvious, namely, that the Center's top priority is not its civil case, but this criminal case. Nevertheless, the Center backed up the Government in its argument that certain materials are not relevant to the suppression hearing and attempted to join the United States in requesting a redaction of certain items. The Center obviously has no standing to argue "relevance", that is, unless the Center and the United States have merged for the purposes of this case.

28. In its request for redaction, the Government sought to eliminate certain items from the Center's correspondence to the Department, citing, *inter alia*, these reasons:

[P]rovides summary of evidence which is coextensive with gov't's case.

\* \* \* \* \* \*

[I]nformation lists gov't witness and expected testimony.

\* \* \* \* \* \*

[S]et out some theory of gov't's case. . . .

\* \* \* \* \* \*

"Possible Criminal Violations of Klan Leaders"—identi[fi]es many gov't witnesses and provides discovery.

29. Nine days before the five year statute of limitations would have expired, the defendants in this cause were indicted by the Grand Jury. The Center promptly congratulated the Department.

30. As stated by the Government at the suppression hearing, it plans to offer into evidence at the criminal trial the civil depositions, or portions thereof, of defendants Riccio, Steele and Handley, and plans to use other civil depositions or information obtained from them.

31. None of the depositions which were taken in the civil case was taken pursuant to the provisions of Rule 15, F.R.Cr.P. For aught appearing, not one of the deponents in the civil case will be "unavailable", as unavailability is defined in Rule 804(a) of the Federal Rules of Evidence.

32. Six out of the nine defendants in this case have been declared "indigent" and have received appointed counsel who are now representing them in order to protect their rights under the Sixth Amendment.

33. Not one of the defendants who was deposed in the civil case, no matter how indigent, had appointed counsel at the time his deposition was there taken.

34. In the Government's response to the defendants' motions for a bill of particulars, the Government has named the following persons as unindicted co-conspirators: Jack Mize, Tony Anderson, Kenneth Traylor, Tim Arnold, Alan Anderton, Wayne Bushong, James Gwin, Lloyd Letson, Johnny Reyer, Larry Sandlin, Cattenia Lamar, James Smith, Greg Stinson, Bertis Kilgo, Edna Davis, Ann Shaffer, Welch Shaffer, Jerry Lamar and Wilburn Wynn. Most of these persons were deposed in the civil case, and most were defendants there.

35. In its issue of May 28, 1984, *Newsweek* published an article based on interviews with Rinzel, Dees and Stanton. The article is obviously hearsay, and it is not evidence, but the Court, by indulging only the most logical inferences from the actual evidence, reaches the same ultimate conclusions of fact reached by *Newsweek,* viz:

Five years ago this week, about 100 black protesters marched down Lee Street in Decatur, Ala., where they were met by about 125 Ku Klux Klansmen carrying ax handles and guns. When the ensuing brawl and firing stopped, the state managed only one felony conviction: a black man for shooting a robed Klansman. The official investigation of the KKK's role went nowhere. Last week, however, just nine days before the statute of limitations was due to expire, federal indictments were filed against seven Klan leaders and two members. The charges grew out of an unusual partnership between the U.S. Justice Department and civil-rights lawyers, who finally broke through the Klan's conspiracy of silence by brandishing the twin

threats of courthouse exposure and debilitating legal costs.

Initially, federal officials took the case seriously. But when Attorney General Griffin Bell dispatched FBI agents to Alabama, the Klansmen refused to crack and continued to blame the clash on the police and the black marchers. Stymied, the Feds closed their file. Then Morris Dees, head of the Southern Poverty Law Center in Montgomery, Ala., picked up the cause. Dees, a lawyer for the black protester who had been convicted in Decatur, said that a review of news photos plus testimony in the criminal case strongly suggested that the Klansmen had conspired to disrupt the march. But he needed more than a theory. So he brought a civil damage suit against the Klan, hoping to uncover facts prosecutors could use.

Sometimes a docket number is more powerful than a badge. Stunned at the high cost of defending themselves, Klansmen began to cooperate with Dees's men. One defendant's lawyer offered his client's cooperation in describing a Klan planning session in exchange for being dropped from the suit. Then Dees went fishing among defendants yet to hire lawyers. Two of them, Huntsville Klan members Douglas and Carlotta Berryhill, testified that two high-ranking leaders, including Roger D. Handley, then second in command of the Invisible Empire, Knights of the KKK, had planned the assault. His theory buttressed, Dees brought his new evidence to federal prosecutor Daniel Rinzel, who reopened the case.

**"Vampire"**: Still, a criminal case needs more than a couple of tales. So two SPLC investigators, armed with about 100 mug shots, took to the back roads of Alabama to find other prospective Klan witnesses. Whenever they found one, they served a subpoena, which often proved surprisingly intimidating. "Because they thrive on secrecy," says investigator Bill Stanton, "a Klansman looks at a courthouse the way a vampire sees a crucifix." Eventually enough evidence wound up before a federal grand jury to indict nine Klansmen for conspiring to violate the civil rights of the marchers. Five of them were also charged with obstructing the FBI's investigation. Among those named were former Grand Dragon Handley and Alabama Titan Ray W. Steele. For his part, Dees praised the Reagan Justice Department and predicted that the criminal case would break the Klan in Alabama. Now Dees can turn his attention to another investigation: finding the arsonists who destroyed his office building last July.

The long and the short of it is that there was a very significant degree of participation by the Department in the Center's investigative activities after the Department's file was reopened, so that the description "unusual partnership" is not in the least inaccurate, despite the understandable disclaimers offered by the Department and by the Center after the motions to suppress were filed. The Department's protestations of innocence cannot stand in the way of a conclusion that it had, in practical effect, constituted the Center as its investigative arm and had given it *carte blanche.*

### Conclusions of Law

*Government's First Argument:*

The Government first opposed an evidentiary hearing on defendants' suppression motions. To some extent the motions were vehicles for a fishing expedition, but there was no impermissible inquiry by defendants into the Government's case itself, because the evidence was carefully limited to testimony and documents which bear on the constitutionality of the use by the Government of certain items of evidence. If it was a fishing expedition it caught some sizeable fish. The Government's first line of defense thus fails.

*Government's Second Argument:*

■ The Government's second line of defense is that defendants effectively waived their Fifth Amendment privilege when they were deposed in the civil action. It is true that some defendants made more valiant efforts than others to preserve their privi-

lege against self-incrimination, but under the totality of circumstances which each defendant faced, the Court cannot conclude that any defendant intelligently and voluntarily waived such a precious constitutional right. If lawyer Willingham was successfully intimidated by lawyer Dees (with Judge Haltom's unwitting cooperation), then any inadvertent waiver which Willingham made on behalf of his clients creates a separate and serious constitutional question, namely, the right of a prospective criminally accused to the advice of competent counsel.

The problem is further compounded by Judge Haltom's misapplication of *Black Panther Party v. Smith*, 661 F.2d 1243 (D.C.Cir.1981), which was vacated by the Supreme Court at 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982), a fact not shown in *Judge Haltom's order of February 8, 1983*. That order, which purportedly held that defendants had *no privilege against self-incrimination*, applied the so-called "balancing test" articulated in *Black Panther*. The most crucial difference between *Invisible Empire* and *Black Panther* is that the Black Panthers were *plaintiffs*, whereas the Invisible Empire and its members are *defendants* in Judge Haltom's case. It is one thing to contemplate the possible sanction of dismissing a civil plaintiff's damage suit when he refuses to respond to defendant's discovery requests because he wants to avoid possible self-incrimination. The imposition of a million dollar default judgment and/or a finding of contempt for a defendant's refusal to answer a civil plaintiff's questions under oath is quite another. Secondly, even in *Black Panther* the D.C. Circuit balanced a civil defendant's need for discovery against a plaintiff's rights against self-incrimination and recognized that even a civil *plaintiff* has some residual Fifth Amendment privileges.

An important holding in *Black Panther*, pertinent to this case, is found at 661 F.2d 1265:

Membership lists of groups engaged in political expression clearly deserve some First Amendment protection. The Supreme Court recognized this need in *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), which held that Alabama could not force the NAACP to reveal its membership list. The Court stated, "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective * * * restraint on freedom of association * *."

This expression is followed at 661 F.2d 1273 with the following flat holding:

... as appellants correctly point out, *identification of potential witnesses is within the scope of the Fifth Amendment privilege.* (emphasis supplied).

This truism is hardly consistent with Judge Haltom's order of February 8, 1983, which ordered that all defendants identify every fellow Klansman and identify everybody in every photograph.

If the Government had been a formal party in the civil action, instead of an extremely interested, covertly involved bystander, the provisions of 18 U.S.C. § 6002 might have come into play on February 1, 1983. Under this statute, the deponents could have been granted formal immunity. By enacting § 6002 Congress clearly recognized the prejudice which can result if a witness is forced in a civil suit to testify against himself, and Congress provided a device for dealing with the problem. As a practical matter, Judge Haltom's order of February 8, 1983, may have effected such an immunity by necessary implication or by accident.

A collateral issue arises from the absence of anything approaching a *Miranda* warning prior to the taking of the depositions of criminal targets in the civil case. While *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is ordinarily limited to interrogation after restraint or custody, *United States v. Prudden*, 424 F.2d 1021 (5th Cir.1970), sheds light on *Miranda's* extension beyond such precise facts. In criticizing the overly broad *Miranda* interpretation announced by the Seventh Circuit in *United States v. Dickerson*, 413 F.2d 1111 (7th Cir.1969),

the Fifth Circuit analyzed *Miranda* and the line of cases which follow it, and distinguished informal interrogation by revenue agents and other federal investigators from interrogation conducted under "compulsion". At 424 F.2d 1028 the Fifth Circuit said "we are particularly unwilling to extend it [*Miranda*] to an adult experienced businessman, a law school graduate, who for over a year voluntarily furnished selected corporate and personal records to tax agents—not claimed to be overbearing but over kind". The only "kindness" shown by the Center to the civil defendants was the holding out of the possibility of dismissal. These civil defendants were not "experienced businessmen" or "law school graduates". What happened here sounds more like the Fifth Circuit's recollection of the *Miranda* rationale at 424 F.2d 1026, where the Fifth Circuit described the Supreme Court's reasoning as follows:

> The Court continued by pointing out that *sophisticated psychological techniques* had been developed by police to supplant the oft condemned use of physical force to extort confessions ... (emphasis supplied).

Continuing at 424 F.2d 1029, the Fifth Circuit pointed out: (a) "that [the defendant] was never *threatened*"; (b) "there is no evidence that the incriminating evidence was *coerced* as a matter of law; i.e., was the result of in-custody interrogation or anything approaching comparable *pressures*"; and (c) that the deponent "came to the office *voluntarily*". (emphasis supplied). It surely cannot be said of the defendants in the instant case that they were not "threatened", or not "coerced", or not placed under "pressures", or that they appeared "voluntarily". To the contrary these defendants testified under the compulsion of a civil subpoena, backed up by an express court order which categorically told them they had no Fifth Amendment privilege. Stanton aptly used the word "squeeze" to describe the situation he had them in.

*Government's Third Argument:*

█ Next the Government urges the "silver platter" doctrine, advancing the argument that any overreaching, illegal or oppressive acts by the Center in obtaining its evidence, is not attributable to the Government, which simply passively received information and evidence from a private law firm which was only performing its duty as a citizen. The Court has already found from convincing evidence that the relationship between the Department and the Center was not benign. The Department cannot divorce itself from the overreaching activities of the Center. It therefore must live with the following statement from the Fifth Circuit in *United States v. Mekjian*, 505 F.2d 1320, 1327 (5th Cir.1975):

> *Burdeau v. McDowell*, 1921, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 has made it clear that the fourth amendment was intended as a restraint on the activities of the government and its agents and is not addressed to actions, legal or illegal, of private parties. Where no official of the federal government has any connection with a wrongful seizure, or any knowledge of it until after the fact, the evidence is admissible. See *United States v. Harper*, 7 Cir.1971, 458 F.2d 891, cert. denied, 406 U.S. 930, 92 S.Ct. 1772, 32 L.Ed.2d 132; *United States v. McGuire*, 2 Cir.1967, 381 F.2d 306, cert. denied, 389 U.S. 1053, 88 S.Ct. 801, 19 L.Ed.2d 848; *Barnes v. United States*, 5 Cir.1967, 373 F.2d 517. No objection, therefore, has been raised or could be raised as to the admissibility of any records copies before the initial contact of Mrs. Jones with BS.
>
> A much more difficult issue arises once the government is contacted. The fourth amendment is given a generous interpretation in order to insure that its safeguards *are not evaded by circuities. Byars v. United States*, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520. *Fourth amendment protections can be effectively undercut by the intervening agency of non-governmental individuals. Accordingly, where federal officials actively participate in a search being conducted by private parties or else stand by watching with approval*

*as the search continues, federal authorities are clearly implicated in the search and it must comport with fourth amendment requirements.* (emphasis supplied).

A leading case here applicable is *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). There the Supreme Court reversed the Fifth Circuit, holding in a taxpayer's criminal case at 96 S.Ct. 1575:

> The proposition that the Fifth Amendment protects private information obtained without compelling self-incriminating testimony is contrary to the clear statements of this Court that under appropriate safeguards private incriminating statements of an accused may be overheard and used in evidence, *if they are not compelled at the time they were uttered, Katz v. United States*, 389 U.S. 347, 354, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967); *Osborn v. United States*, 385 U.S. 323, 329–330, 87 S.Ct. 429, 432–433, 17 L.Ed.2d 394, 399–400 (1966); and *Berger v. New York*, 388 U.S. 41, 57, 87 S.Ct. 1873, 1882, 18 L.Ed.2d 1040, 1051 (1967); cf. *Hoffa v. United States*, 385 U.S. 293, 304, 87 S.Ct. 408, 414, 17 L.Ed.2d 374, 383 (1966); and that *disclosure of private information may be compelled if immunity removes the risk of incrimination. Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). (emphasis supplied).

In the instant case no immunity was granted unless by accident and there was judicial compulsion.

In *Shaffer v. United States*, 528 F.2d 920, 922 (4th Cir.1975), the Fourth Circuit must have anticipated *Fisher* because it held in a tax case that "[i]f the Government wishes to depose the taxpayer, it should obtain use immunity for him as to any criminal proceedings other than one relating to perjury". This holding not only predicted the Supreme Court in *Fisher*, but predicted Congress in 18 U.S.C. § 6002.

The most recent Supreme Court case is *Minnesota v. Murphy*, —— U.S. ——, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). The Government places heavy reliance on *Minnesota*, which involved the use by the State of Minnesota in a criminal prosecution of statements given by a probationer to his probation officer. *Minnesota* does not help the Government. First, the probationer in *Minnesota* was not responding under subpoena. Secondly, the probationer was not placed under oath under the penalties of perjury. Thirdly, the probationer's statement was unrelated to a criminal investigation then in progress and involving him. Fourthly, the Supreme Court did not retreat at all from *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), and held at 104 S.Ct. 1141–1142:

> It has long been held that this prohibition [the Fifth Amendment] not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also "privileges him not to answer official questions put to him in any other proceeding, *civil* or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings". (emphasis supplied).

The last, and key distinction between *Minnesota* and the instant case is found at 104 S.Ct. 1143, where the Supreme Court pointedly said:

> But if he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege *and would suffer no penalty as the result of his decision to do so.* As the Minnesota Supreme Court recognized, application of this general rule is inappropriate in certain well-defined situations. In each of those situations, however, some *identifiable factor "was held to deny the individual a 'free choice to admit, to deny, or to refuse to answer.'"* *Garner v. United States*, supra, 424 U.S. [648] at 657, 96 S.Ct. [1178], at 1183 [47 L.Ed.2d 370] (quoting *Lisenba v. California*, 314 U.S. 219, 241, 62 S.Ct. 280, 292, 86 L.Ed. 166 (1941)). *Because we conclude that no such factor was present here,* we hold that the Minnesota Supreme Court erred in excluding the probation officer's testimony. (emphasis supplied).

This Court cannot here find as the Supreme Court found in *Minnesota,* "that no such factor was present here". To the contrary, the overwhelming weight of the evidence reveals that tremendous pressures were applied to obtain the sworn testimony of the defendants in this case. To find here that defendants "would suffer no penalty" in light of Judge Haltom's order would be to ignore reality.

### Government's Fourth Defense:

 The Government challenges defendants' standing to object to the introduction of the depositions taken of non-defendants. This argument would seem to concede the impropriety of the Government's use of the civil depositions of defendants themselves. Under the rationale of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), any co-defendant at a joint trial has the right to object to the admission of his co-defendant's confession if it implicates the objecting defendant. To permit the introduction of the deposition of an alleged co-conspirator when the co-conspirator is "available", would clearly violate the right of confrontation and the right to cross examine guaranteed by the Sixth Amendment. If a co-defendant in this case should not take the stand, as would be his right, the other defendants would be denied their Sixth Amendment rights if his deposition were introduced. Of course, if a defendant should choose to take the stand, the use for purposes of cross-examination of his prior deposition taken in a civil case will present another question not here presented.

### Government's Fifth Defense:

██ The Government's last ditch defense is its contention that some, if not all, of the evidence contained in the civil depositions of the defendants, and the evidence which followed indirectly as a result of the information gleaned from those depositions, would have been uncovered by the FBI anyway. The Government invokes *Nix v. Williams,* —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), decided on June 1, 1984. The Government's reliance upon *Nix* is misplaced. Neither the "independent source doctrine" (which allows the admission of evidence that has been discovered by means wholly independent of any constitutional violation), nor the "inevitable discovery doctrine" (which allows the admission of evidence that was not independently discovered but would undoubtedly have been discovered), applies here because this Court has already found as a fact based on the overwhelming evidence that the Government did not discover by means wholly independent of the Center's activities the evidence it here seeks to offer, and would not have obtained the same information absent the constitutional violations. Although the so-called "exclusionary rule" is not here involved, an analogy can be made. According to *Nix,* the exclusionary rule begins "with the premise that the challenged evidence is *in some sense* the product of illegal governmental activity". (emphasis the Supreme Court's). 104 S.Ct. 2509, quoting *United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 1250, 63 L.Ed.2d 537 (1980). In the instant case, the challenged evidence is in more than one sense the product of a partnership so unusual as to be illegal. In *Nix,* the Court of Appeals was reversed for requiring that the prosecution prove an absence of bad faith by the prosecutors. In the instant hearing, no such burden was placed on the Government. To the contrary, the burden of proving the interconnection between the Department and the Center was always on defendants, and defendants had an uphill battle to prove the pertinent facts in the face of the joint "stonewall" set up by the Department and the Center.

### Government's Sixth Defense:

The Government, conceding for the sake of the argument, that the defendants' depositions are inadmissible because of the unconstitutional taint, would separate the fruit from the tree. The Court certainly agrees with and follows the admonition of the Supreme Court in *Nix, supra,* that while "incriminating evidence derived from the primary evidence" cannot, where it constitutes the tainted "fruit" of unlawful government conduct, be used by the prosecution, but such information is not auto-

matically "sacred and inaccessible" where "knowledge of [such facts] is gained from an *independent source*". 104 S.Ct. 2508. It is impossible at this stage of these proceedings to know what evidence the Government plans to offer and whether it is the fruit of the tainted tree or was obtained from an independent source. This determination must await the Government's offer of specific items of evidence at trial. When and if any questionable evidence is offered, a mini-hearing outside the presence of the jury will be required. Meanwhile, there is no basis for suppressing in advance of trial any evidence except the depositions of the defendants and of their unindicted alleged co-conspirators.

*Rule 15, Federal Rules of Criminal Procedure:*

Rule 15, F.R.Cr.P., provides for the limited use of depositions in criminal proceedings. It makes no exception for depositions of the defendants, or others, taken in a civil action. Not only were the provisions of Rule 15 not followed in the taking of the depositions which the Government now suggests using in its case, but there is no showing by the Government that any such witness is "unavailable" as "unavailability" is defined in Rule 804(a) of the Federal Rules of Evidence. *See* Rule 15(e). The most obvious provision of Rule 15 here persuasive is found in Rule 15(d) which says:

> ... [I]n no event shall a deposition be taken of a party defendant without his consent ...

While the draftsmen of Rule 15 may not have been thinking about depositions taken in separate, non-criminal cases, they clearly realized the severe limitations on the deposing of criminally accused persons without their consent. Interestingly, the notes of the Advisory Committee appearing under Rule 15 state:

> Unlike the practice in civil cases in which depositions may be taken as a matter of right by notice without permission of the court (Rules 26(a) and 30, Federal Rules of Civil Procedure, 28 U.S.C., Appendix), this rule permits depositions to be taken only by order of the court, made in the exercise of discretion and on notice to all

parties. It was contemplated that in criminal cases depositions would be used only in exceptional situations, as had been the practice heretofore.

### Conclusion

The Government warns of dire and long range consequences in the event of a suppression of defendants' depositions and the depositions of the alleged co-conspirators in this case. The Court perceives dire and long range consequences if the depositions are *not* suppressed where the Center was, in effect, the undercover alter ego of the Department.

It would certainly be incorrect and unfair of anyone to surmise from this opinion that this Court has sympathy for the Ku Klux Klan as an organization. This Court agrees with the general understanding that the Klan is a vigilante group which undoubtedly from time to time violates the constitutional rights of citizens. However, one vigilante group does not justify the creation and operation of a counter-vigilante group in violation of the constitutional rights of the first group. The basic distinction in this case between the Klan and the Center is that the Klan members were and are unsophisticated, impecunious and ignorant of legal procedures, whereas the lawyers and investigators at the Center are quite sophisticated, socially acceptable and well financed. To tolerate a rape of the rights of members of the Klan would be a recognition that some sort of double standard exists for the application of constitutional protections. A member of the Southern Christian Leadership Conference surely has every right to expect the federal courts to uphold and to protect his civil rights. A member of the Ku Klux Klan has every right to expect the same.

For the reasons above set forth, an order of suppression will be entered.