612 A.2d 258

**Steven Howard OKEN**

v.

**STATE of Maryland.**

**No. 25, Sept. Term, 1991.**

Court of Appeals of Maryland.

Sept. 17, 1992.

**632**

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, Nancy S. Forster, Asst. Public Defender, all on brief), Baltimore, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., M. Jennifer Landis, Asst. Atty. Gen., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and BELL, JJ.

KARWACKI, Judge.

On January 18, 1991, a jury in the Circuit Court for Baltimore County convicted the appellant, Stephen Howard Oken, of the first degree murder of Dawn Garvin, of a first degree sexual offense upon Ms. Garvin, of burglary, and of the use of a handgun in the commission of a crime of violence. Having previously entered a plea of not criminally responsible and having been granted a bifurcated hearing on the issues of guilt or innocence and criminal responsibility, Oken elected to have the court decide whether or not he was criminally responsible. On January 22, 1991, the court found Oken to be criminally responsible. The sentencing for Oken's guilt of first degree murder was held before the same jury on January 24 and 25, 1991. The jury sentenced Oken to death. The trial judge subsequently imposed sentences of life imprisonment for the first degree sexual offense, a consecutive term of twenty years for the burglary, and a consecutive term of twenty years for the use of a handgun in the commission of a crime of violence. Oken has appealed those judgments. We begin by reciting the facts surrounding Dawn Garvin's murder.

At midnight on Sunday, November 1, 1987, Keith Douglas Garvin arrived at the United States Navy base in Oceana, Virginia. Mr. Garvin, who had a pass from his naval superiors, had just spent the weekend with his wife, Dawn Garvin, at their apartment in the Baltimore County community of White Marsh and was returning to his station in Oceana. Upon his arrival at the base, Mr. Garvin attempted to call his wife to notify her that he had arrived safely. Although the telephone rang at their White Marsh apartment, there was no answer. After making several additional unsuccessful attempts to call his wife, Mr. Garvin became worried and telephoned his father-in-law, Frederick Joseph Romano. Because Mr. Romano lived in close proximity to

the Garvins' apartment, Mr. Garvin asked Mr. Romano to check on his wife. Mr. Romano agreed, and attempted to telephone his daughter twice. Both times there was no answer. Concerned about the fact that numerous calls to his daughter had gone unanswered, Mr. Romano decided to drive to his daughter's apartment.

When Mr. Romano arrived at his daughter's apartment, he found the front door to the apartment ajar, all the lights in the apartment turned on, and the television blaring. Sensing that something was wrong, Mr. Romano rushed into the apartment and found his daughter, Dawn, in the bedroom lying on the bed nude with a bottle protruding from her vagina. While attempting to give her cardiopulmonary resuscitation ("CPR"), Mr. Romano observed that there was blood streaming from her forehead. He immediately called for assistance, and paramedics arrived shortly thereafter. A paramedic then began to administer CPR, but his efforts were in vain. Dawn Marie Garvin was dead.

At 2:30 a.m., on November 2, Detective James Roeder of the Baltimore County Police Department arrived at the Garvins' apartment to inspect the scene of the murder. Detective Roeder testified that when he entered the Garvins' apartment he saw no signs of forced entry. Once inside, he observed a brassiere, a pair of pants, tennis shoes, a shirt, and a sweater on the floor near the sofa in the living room. The brassiere was not unhooked, but instead, was ripped on the side. The pants were turned inside out. Roeder also noticed a small piece of rubber on the floor near the television set. In the bedroom, Roeder found two spent .25 caliber shell casings on the bed, one of which was lying on top of a shirt. The shirt was blood stained and had what Roeder believed to be a bullet hole in it.

An autopsy of Ms. Garvin's body revealed that she had died as the result of two contact gunshot wounds; one of the bullets entered at her left eyebrow and the other at her right ear.

The last person to see Dawn Garvin before she was fatally attacked was her brother, Frederick Anthony Romano. At 8:30 p.m. on November 1, Mr. Romano stopped by his sister's apartment to pick up a set of keys to Keith Garvin's car. Mr. Garvin had left the car at the White Marsh apartment so that it could be repaired during the week. Mr. Romano only stayed at his sister's apartment for about five minutes. When he left the apartment, Ms. Garvin was preparing to walk her dog. We will state additional facts as necessary in addressing the several contentions of the appellant.

## I.

Oken's first contention is that the trial court affirmatively misadvised him concerning his right to testify at the criminal responsibility hearing. As a result of such advice, Oken maintains that he did not knowingly, intelligently, and voluntarily waive his right to testify. The relevant advice given to Oken at the criminal responsibility hearing was as follows:

"[THE COURT]: Mr. Oken, although we didn't cover this when you put on your testimony yesterday with respect to criminal responsibility, you do have, as you had in the original trial, the right to testify or not testify as it relates to this stage of the proceedings as to whether or not you were criminally responsible by reason of insanity.

"If you choose not to testify, I can't think that, I can't take any inference that, in fact, you are criminally responsible because you refused to testify. However, I'll have to decide the case on the basis of the evidence that has been presented on this issue.

"If you choose to testify, you are subject to being cross examined by the Assistant State's Attorney on all aspects as they relate to the issue of criminal responsibility and as they relate to the direct examination which would be elicited by your counsel. So you would have, you would be subject to cross examination.

*"In addition, in the event that you were found to be criminally responsible and the State chose to do so, any testimony that you, that was admitted in these proceedings would be admissible in connection with the sentencing if, in fact, that sentencing were conducted before the jury and the State could present any such testimony at that time.*

"So that you have the right to testify or not as to the issue in this stage. If you choose not to, I cannot infer that you are criminally responsible as a result of that choice. I would have to decide the case on the basis of the evidence that has been presented on this issue as well as the evidence that came in in connection with the guilt/innocence phase....

"So that you can choose not to testify or you can choose to testify. If you choose to testify, you're subject to cross examination, including any prior criminal record that you have that relates to credibility. *And any testimony that you would offer in this proceeding, in the event that you were held or found criminally responsible, could be presented to the jury in the event that you elect to have sentencing done by a jury if the State chose to do so."* (Emphasis supplied).

Oken argues that the advice given by the trial court was wrong as a matter of law because it suggested to him that his testimony at the criminal responsibility hearing would be admissible *in toto* at the sentencing hearing. He asserts that a criminal defendant's testimony at one stage of the proceedings against him is not automatically admissible against him at a subsequent stage of the proceedings without an evaluation of the testimony's relevance and its probative value when compared to its prejudicial effect.

In support of this contention, Oken relies primarily on *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In *Simmons*, the Supreme Court held that a defendant who testifies in a Fourth Amendment pretrial suppression hearing may not have his testimony from that hearing admitted against him in a subsequent

trial on the merits. *Id.* at 394, 88 S.Ct. at 976, 19 L.Ed.2d at 1259. Although Oken acknowledges that the *Simmons's* holding was based on the Fourth Amendment claim addressed therein, he maintains that reasoning in *Simmons* has been applied in other contexts as well[1] and, therefore, is equally applicable in the case *sub judice.*

On the other hand, the State argues that Oken's contention regarding his right to testify was waived because he never challenged or objected to the trial court's advice. Alternatively, the State asserts that even assuming, *arguendo,* that Oken's claim was properly preserved, it fails on the merits because the Supreme Court's decision in *Simmons* is not applicable to the instant case, and this Court's decision in *Gilliam v. State,* 320 Md. 637, 579 A.2d 744 (1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991) is fatal to Oken's contention. Because we agree with the State's arguments concerning the merits of Oken's claim, we hold that the trial court did not commit reversible error in advising Oken regarding his right to testify at the criminal responsibility hearing. We explain our holding.

Initially, it is clear that Oken's reliance on *Simmons* is misplaced in light of the Supreme Court's more recent decision in *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). In *McGautha,* the defendant relied upon the Supreme Court's reasoning in *Simmons* to support his claim that his unitary trial on the issues of guilt or innocence and mitigation of a possible death sentence created an "intolerable tension" between his right not to incriminate himself and his right to testify on the issue of

---

**1.** *E.g., United States v. Ragins,* 840 F.2d 1184, 1193 (4th Cir.1988) (pretrial double jeopardy hearing testimony); *United States v. Trejo–Zambrano,* 582 F.2d 460, 464 (9th Cir.1978) (waiver of Fifth Amendment privilege at one stage of proceeding is not a waiver of that right for other stages); *United States v. Handley,* 591 F.Supp. 1257, 1271 (N.D.Ala.1984) (defendant's sworn testimony at civil deposition is not admissible against same defendant in a criminal trial arising out of the same events).

mitigation. In rejecting this claim, the Supreme Court declared that its earlier decision in *Simmons* was strictly limited to the protection of a defendant's testimony in a hearing on a motion to suppress evidence alleged to have been obtained in violation of his constitutional rights. *Id.* at 211–12, 91 S.Ct. at 1469, 28 L.Ed.2d at 728–29. Therefore, we find Oken's reliance on *Simmons* unpersuasive. Instead, we look to the principles we set forth in *Gilliam,* and *Morales v. State,* 325 Md. 330, 600 A.2d 851 (1992).

In *Gilliam, supra,* the defendant was convicted of first-degree murder, committed during the course of a kidnapping and robbery, and was sentenced to death. On direct appeal, the defendant claimed that two colloquies between defense counsel and him, one at trial and the other at the capital sentencing proceeding, may have affirmatively misled him to believe, in part, that the court would likely acquit him if he elected not to testify. *Gilliam, supra,* 320 Md. at 651–52, 579 A.2d at 751. In evaluating this claim, we emphasized that there is no requirement that a represented defendant be advised in open court, by either the trial judge or counsel, on the issue of whether to testify or remain silent. Instead, we held that there is a rebuttable "presumption" that a represented defendant has been fully informed regarding his right to testify, and that, absent some "clear" indication in the record to the contrary, appellate courts will presume that whatever course of action the defendant ultimately takes at trial was in fact a voluntary decision made after a complete, but not necessarily on-the-record, consultation with defense counsel. *Id.* at 655–56, 579 A.2d at 753. Although we are cognizant of the fact that *Gilliam* addressed the propriety of advice from defense counsel to the defendant, we believe, as evidenced in our recent decision in *Morales, supra,* 325 Md. at 330, 600 A.2d at 851, that our reasoning is equally applicable to the instant case where the advice came from the trial court.

In *Morales,* an unrepresented defendant was convicted of possession of cocaine with intent to distribute and conspiracy to distribute cocaine. At the close of the State's case,

the trial court advised the defendant of his right to testify or remain silent. Initially, the defendant indicated that he would like to testify on his own behalf. However, the trial court repeatedly warned him, "if you take the stand and testify and you have been convicted of a crime before, they may ask you, they meaning the State may ask you about that." *Id.* at 334, 600 A.2d at 853. Immediately after hearing that advice, the defendant changed his mind and said, "I don't want to go up there." *Id.* In light of these facts, we determined that:

"A reasonable inference from the quoted colloquy between the judge and Morales is that Morales intended to testify until the judge advised him to 'think about this' and that his convictions could be brought out to show whether he should be believed or not. Since Morales apparently changed his decision to testify based on the trial court's incorrect implication that all of his prior convictions could be used to impeach him, the defendant's decision to waive his constitutional right to testify and to exercise his constitutional right to remain silent was not knowingly and intelligently made. If the trial court— although not required to do so—had given the correct information regarding impeachment by evidence of prior convictions, the result would be different."

*Id.* at 339, 600 A.2d at 855.

■ Applying these standards to the case *sub judice,* we look to the record. Shortly after the trial court advised Oken concerning his right to testify the following colloquy occurred:

"THE COURT: Now, Mr. Oken you have had an opportunity to consult with your counsel with respect to this election, is that correct?

"THE DEFENDANT: Yes.

"THE COURT: All right.

"THE DEFENDANT: Yes.

"THE COURT: And do you elect to testify or not to testify, sir?

"THE DEFENDANT: I have not come to a decision on that. I would like to wait until the report of Dr. Spodak is in.

"THE COURT: Well, Dr. Michael Spodak is not going to be presented by the State. They have closed their case. There is no report of Dr. Spodak available and Dr. Spodak, according to representations of the Assistant State's Attorneys in my chambers with your counsel, is that they have had no communications with Dr. Spodak in connection with his examination of you last night, I believe. Is that correct, sir?

"THE DEFENDANT: Yes, sir.

"THE COURT: He saw you last night? So that there is no report or summary of any examination by Dr. Spodak available.

"Your counsel was with you last night, was he not, in connection with that examination?

"THE DEFENDANT: Yes.

"THE COURT: All right. Well, so your request to delay until such a report is denied.

"THE DEFENDANT: Can I have one second?

"THE COURT: Certainly.

(Pause.)

"THE DEFENDANT: I will not testify.

"THE COURT: You choose not to testify, is that correct, sir?

"THE DEFENDANT: That's right."

In light of this record, we find no clear indication that the trial court's advice regarding Oken's right to testify had any influence on his decision not to testify. Indeed, the record reflects that: 1) Oken acknowledged consulting with the defense counsel concerning his election to testify at the criminal responsibility hearing prior to the trial court's advice, and 2) Oken was given an additional opportunity to consult his attorney about testifying after the court's advice. Therefore, on the basis of this record we are not convinced that Oken did not knowingly, intelligently, or

voluntary waive his right to testify at the criminal responsibility hearing.

## II.

Oken next focuses on the trial court's instructions to the jury regarding its role in determining whether the aggravating circumstance [2] of Dawn Garvin's murder outweighed the circumstances mitigating his guilt. Prior to sentencing, Oken requested that the jury be instructed as follows:

> "I advise you that if for any reason you are unable within a reasonable period of time to reach a unanimous judgment as to the balancing required by Section ____ of the form, I will sentence Steven H. Oken to life imprisonment."

The trial court denied Oken's request, and, instead, instructed the jury that their determination of whether the aggravating circumstances outweighed the mitigating circumstances "must be unanimous," and that until all 12 of the jurors agreed on whether the answer was "yes" or "no," they could not move onto the next section of the sentencing form. Oken asserts that, pursuant to Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 413(k)(2),[3] the trial court was required to instruct the jury that a failure to reach a unanimous agreement on whether the aggravating circumstances outweighed the mitigating circumstances would result in a sentence of life imprisonment. We disagree.

■ This Court has already rejected the notion that a trial judge must instruct the jurors in a capital sentencing proceeding prior to their deliberations that if they cannot

---

**2.** The sole aggravating circumstance on which the State relied in seeking the death penalty for the murder was that Oken had committed it "while committing or attempting to commit a ... sexual offense in the first degree." Md.Code (1957, 1992 Repl.Vol.) Art. 27, § 413(d)(10).

**3.** Section 413(k)(2) provides:
"If the jury, within a reasonable time, is not able to agree as to whether a sentence of death shall be imposed, the court may not impose a sentence of death."

agree on sentencing within a reasonable time a life sentence would be imposed. *Calhoun v. State,* 297 Md. 563, 593–95, 468 A.2d 45, 58–60 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); *Grandison v. State,* 305 Md. 685, 771, 506 A.2d 580, 623, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986). *See also Booth v. State,* 327 Md. 142, 153–54, 608 A.2d 162, 167–68 (1992).

### III.

Oken's third contention concerns his pre-trial suppression motions. He contends that the hearing court erred in denying his motion to suppress evidence seized during a search of his home in Maryland on November 16, 1987 and from his person upon his arrest in Maine on November 17, 1987. For the sake of clarity, we shall treat Oken's contention as two separate claims: one dealing with the search of Oken's home in Maryland on November 16, 1987, and the other with his arrest in Maine on November 17, 1987. Before addressing the merits of each claim, we will set forth the facts developed at the hearings on his suppression motions.

*Search of Oken's Home on November 16, 1987*

At 9:00 a.m. on the morning of November 16, 1987, approximately two weeks after Dawn Garvin's murder, Sergeant Sidney Branham of the Baltimore County Police Department was patrolling the White Marsh area when he received a dispatch of a "suspicious condition" concerning a missing person at 62 Stillwood Circle, a townhouse which was the residence of Oken and his wife, Phyllis Hirt Oken. Sergeant Branham went to that address and was met by four individuals standing outside of the home. One of those individuals, a Ms. Danielle Jones, informed Sergeant Branham that "she had reason to believe that her sister, Patricia Hirt, was missing and that some harm had come to her, and she came to 62 Stillwood Circle to locate her sister." Jones also told Sergeant Branham that when she arrived at this address, she found the door to the residence partially ajar

and entered. Jones related that while inside the house, she had noticed that it was in disarray and that there was blood on the floor near the front entrance.

On the basis of Jones's story, Sergeant Branham decided that he and Lieutenant Harvey should enter the house "to see if there was anyone injured in the house, [and] to look for any suspect." Once inside the house, Sergeant Branham made certain observations. He saw blood smeared on the floor in the foyer and on the door post, a towel lying on top of a trash can in the kitchen with what appeared to be dried blood stains on it, and articles of women's clothing strewn about the floor in the living room. When Sergeant Branham left the house, he posted an officer at the front door to secure the premises until a search warrant could be obtained.

Later that same morning, at about 10:00 a.m., Detective Charles Naylor of the Baltimore County Police Department received a telephone call asking him to proceed to an area near Interstate 95 and White Marsh Boulevard in Baltimore County where the body of a dead woman had been found by the Maryland State Police. Detective Naylor went to this area to investigate. Approximately one hour later, the body of the dead woman was identified as Patricia Hirt.[4]

After the discovery of the dead woman's identity, Detective Naylor was sent to 62 Stillwood Circle where he met with Sergeant Branham. Sergeant Branham informed Detective Naylor of his observations inside the home. Based on these observations and the discovery of Patricia Hirt's body, Detective Naylor prepared an affidavit and application for a search and seizure warrant for Oken's home at 62 Stillwood Circle. A warrant was signed by Judge A. Gordon Boone, Jr., and Detective Naylor returned to 62 Stillwood Circle to execute the warrant. During the search, Detective Naylor seized a .25 caliber handgun from a dresser drawer in the master bedroom. This gun was later

---

**4.** Subsequent to his conviction and sentence in the instant case, Oken pleaded guilty to the murder of Patricia Hirt.

determined to be the weapon that was used to kill Dawn Garvin.

At a pre-trial hearing, Oken moved to suppress the evidence seized from his home pursuant to the search and seizure warrant. The basis for Oken's motion was that Sergeant Branham's initial warrantless entry into the house violated the Fourth Amendment. Oken argued that because Branham's observations made during the illegal entry served as the basis for the warrant obtained by Detective Naylor, the evidence seized during the later search was the "fruit of a poisonous tree." The trial court disagreed with Oken, and ruled that the police acted reasonably in response to the circumstances that were presented to them when they arrived at 62 Stillwood Circle. In short, the lower court found that Sergeant Branham's warrantless entry into Oken's house was justified by the emergency exception to the warrant requirement. *See Mincey v. Arizona,* 437 U.S. 385, 392–93, 98 S.Ct. 2408, 2413–14, 57 L.Ed.2d 290, 299–300 (1978); *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486, 498 (1978); *Stackhouse v. State,* 298 Md. 203, 212, 468 A.2d 333, 338 (1983).

In this Court, Oken posits that Sergeant Branham "could not have 'reasonably' believed that someone in urgent need of help was located in [his] home" because Ms. Jones had already been in the house, and it is reasonable to conclude that she would have told Branham if there was someone inside who needed emergency assistance. Therefore, according to Oken, Branham's decision to make a warrantless entry was not reasonable and could not be justified under the emergency exception to the warrant requirement. We are not persuaded.

■ In determining whether such an emergency existed in the case *sub judice,* "the relevant facts which we [must] consider are limited to those produced at the suppression hearing which are most favorable to the State as the prevailing party on the motion." *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240–41 (1990) (citations omitted).

Although we may make our own independent constitutional appraisal of the record, we will not disturb the trial court's findings of the basic facts unless they are clearly erroneous. *Id.*

In the instant case, Sergeant Branham testified that on the morning of November 16, 1987, he responded to a dispatch on his radio regarding a "suspicious condition" at Oken's townhouse. When he arrived at the townhouse, he was met there by Danielle Jones, who was the sister of Patricia Hirt and of Oken's wife, Phyllis. Jones told Sergeant Branham that she had reason to believe that Patricia Hirt was "missing", that some harm had come to her, and that when she went to Oken's home to check on Patricia, she found the door to the house "ajar", the house in disarray, and blood on the floor near the entrance to the house. Jones did not indicate to Detective Branham whether she had thoroughly searched the house to see if anyone was inside, and, in fact, her call to the police suggested that she obviously desired some type of police assistance in this regard.

Based upon these circumstances, Detective Branham testified that he and Lieutenant Harvey "made a decision to go into the premises to see if there was anyone that was injured inside, [and] to look for ... any criminal that was involved." Detective Branham also testified that the officers "first priority" was locating and attending the victim. Once inside the house, the officers remained only long enough to ascertain whether any people were located therein, and their search was confined to areas that could have concealed a body. The officers did not remove anything from the house, and when they left they posted a guard to secure the premises. Based on our independent constitutional appraisal of this uncontradicted evidence at the suppression hearing, we hold that Sergeant Branham's decision to enter Oken's home was both reasonable and justifiable under the emergency exception to the warrant requirement. Consequently, we hold that the hearing court correctly denied Oken's motion to suppress evidence seized during

Detective Naylor's subsequent search, which was conducted pursuant to a warrant issued in partial reliance upon Sergeant Branham's observations during his warrantless entry of Oken's home.

*Oken's Arrest in Maine on November 17, 1987*

At approximately 1:00 p.m. on November 16, 1987, the same day the Maryland State Police discovered Patricia Hirt's dead body, Oken checked into the Coachman Motor Inn ("Coachman") in Kittery, Maine. According to the general manager of the motel, Diana Ott, Oken stated that he only wanted the room for one night. After filling out the registration form which indicated that he was driving a white Ford Mustang with Maryland registration plates, Oken paid for his room in advance with a Visa credit card. As Ott handed Oken the keys to room 48, the telephone rang. Ott answered, and as she was talking on the telephone, she realized that she still had Oken's credit card in her hand. Ott telephoned Oken in his room and asked him to come back to the desk and get his card at his convenience. At 2:30 p.m., Ott's shift at the registration desk ended. She was replaced by Lori Ward. Since Oken had not returned to claim his card at the time Ott and Ward changed shifts, Ott informed Ward that Oken might be coming to the desk for his card. Ott then went home.

Later that evening, at approximately 6:00 p.m., Ott telephoned the registration desk to check on Ward. There was no answer to her call. Ott continued to call Ward but received no answer. She then telephoned the motel's maintenance man and asked him to check on Ward. The maintenance man returned Ott's telephone call about ten minutes later. He informed Ott that Ward had been found murdered.[5] Ott immediately left for the motel. She arrived at the motel around 6:30 p.m. and stayed there until 12:30 a.m. During that time she did not see Oken or his Mustang.

---

5. Prior to his trial for the murder of Dawn Garvin, Oken was convicted in Maine of the murder of Lori Ward.

On that same day, Oken drove to Freeport, Maine, which is approximately a one hour drive from the Coachman. At 7:54 p.m., Oken checked into the Freeport Inn. According to the desk clerk, Katherine Jones, Oken paid in cash for one night's stay in room 250. As Oken was walking away from the desk, Jones observed blood on the back of his head. Jones brought this fact to Oken's attention, but Oken indicated that he was "okay." Sometime between 10:00 a.m. and 10:30 a.m. on the following morning, November 17, 1987, Oken paid for an additional night's lodging at the Freeport Inn. Oken never checked out of the Coachman.

Returning our attention to the preceding day, November 16, at approximately 6:45 p.m., the Kittery police responded to a distress call from the Coachman. Upon arrival at the motel, the police found the body of Lori Ward in a small room behind the front desk. Ms. Ward had been shot to death.

The police began their investigation of Ward's murder by knocking on the doors of every motel room in the Coachman, including Oken's room, Room 48. There was no response at Room 48. The police then began a log, which they kept until 1:00 a.m. the next morning, of all persons and vehicles entering and exiting the motel. Neither Oken, nor his car were seen that evening.

At 4:45 a.m., on that same morning, Diana Ott returned to the Coachman. As part of her daily morning routine, Ott drove around the parking lot to see what cars were in front of what rooms. Ott testified that the purpose of this check was to discover "what rooms had checked out or if people had left early" so that she could inform her maids as to which rooms to start to clean first. Ott noted that at that time only four cars were in the lot and Oken's was not one of them. At 7:30 a.m., the maids arrived and were ready to start stripping beds and cleaning the unoccupied rooms. In light of the prior night's events, however, Ott decided to call the Kittery police before letting the maids enter the rooms. The police asked Ott to postpone the clean-up of all the

rooms until they could perform a "sweep search" of the rooms.

At 8:00 a.m., on November 17, the Kittery police arrived at the Coachman. Upon their arrival, Ott gave to them, at their request, a list of the rooms which were unoccupied so that they could search these rooms. The list indicated that Room 48, Oken's room, was unoccupied. The police knocked at and entered every unoccupied room, and one occupied room, until they reached Room 48 at approximately 9:30 a.m. This was before the 11:00 a.m. check-out time at the Coachman. There was no answer at Room 48, so the police unlocked the door and entered the room. Once inside Room 48, the police discovered a bottle of vodka, a half-gallon of orange juice, a few small pieces of rope, a pair of socks, a shirt with blood stains on it, and blood smudges on the wall in the bathroom. There were no toilet articles, personal belongings, luggage, or any kind of bags in the room, and the bed had not been turned down.

After discovering these articles in Room 48, the police went to Ott, and asked her who was the last person to stay in Room 48. She checked her records and informed the police that Oken was the last individual to occupy Room 48. She also gave them the license tag number for the vehicle he was driving. When the police sought information by teletype about the registration of that automobile, they learned that Oken was wanted in connection with two murders in Maryland and that the car he was driving had been stolen the previous day in Maryland.

At approximately 5:10 p.m., on November 17, 1987, Oken was arrested at the Freeport Inn. Upon his arrest, the police seized the tennis shoes that he was wearing along with all his personal belongings and his car. During the guilt or innocence stage of Oken's trial, one of the tennis shoes seized was matched with the piece of rubber found in Dawn Garvin's apartment on the night of her murder.

At a pre-trial hearing, Oken moved to suppress the tennis shoes as fruit of an illegal arrest prompted by an illegal

search of his room at the Coachman Inn. The trial court denied suppression of the tennis shoes on the alternative grounds that: 1) Oken had abandoned any expectation of privacy in room 48, and therefore had no standing to challenge the police search of that room,[6] *Duncan and Smith v. State,* 281 Md. 247, 378 A.2d 1108 (1977); and 2) the evidence found in Room 48 would inevitably have been discovered either when a search was made after check-out time [7] or when the maid went to clean the room. *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

On appeal, Oken contends that the hearing court's ruling was erroneous. He claims that Room 48 was not abandoned at the time the police conducted their search prior to the 11:00 a.m. checkout time, and that the prosecution failed to meet its burden of proving that the items found in Room 48 would have been inevitably discovered.

Before addressing the merits of Oken's contentions, we reiterate that:

"When the question is whether a constitutional right, such as the one here, has been violated, we make our own independent constitutional appraisal. . . . by reviewing the law and applying it to the peculiar facts of the particular case. *State v. Gee,* 298 Md. 565, 571, 471 A.2d 712, *cert. denied,* 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 827 (1984). When the facts are in dispute, we accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him. In ascertaining

---

**6.** Prior to his trial in Maine for the murder of Lori Ward, Oken moved to suppress the evidence seized in the warrantless search of Room 48. The trial court denied that motion finding that Oken had abandoned the motel room prior to the time of the search and thus did not have a reasonable expectation of privacy to the room or its contents. The Supreme Judicial Court of Maine affirmed that ruling on Oken's appeal from his conviction of Ward's murder. *State v. Oken,* 569 A.2d 1218 (Me.1990).

**7.** In the instant case, the police thoroughly checked Room 48 after the 11:00 a.m. check-out time with the consent of the motel's manager.

whether he is clearly erroneous, we give 'due regard to the opportunity of the trial court to judge the credibility of the witnesses,' as commanded by Md.Rule 8–131(c). When the question of the dishonor of a constitutional right arises by the denial of a motion to suppress, the relevant facts which we consider 'are limited to those produced at the suppression hearing, *see Trusty v. State,* 308 Md. 658, 521 A.2d 749 (1987), which are most favorable to the State as the prevailing party on the motion.' *Simpler v. State,* 318 Md. 311, 312, 568 A.2d 22 (1990)." *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240–41 (1990).

### A.

Oken's first contention regarding the hearing court's denial of his motion to suppress the tennis shoes is that the hearing court incorrectly applied the test for abandonment announced by this Court in *Duncan and Smith, supra,* 281 Md. at 265, 378 A.2d at 1119. In *Duncan and Smith,* we held that:

> " 'Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts.... All relevant circumstances existing at the time of the alleged abandonment should be considered.... The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.' "

(quoting *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir.1973) (citations omitted)). According to Oken, "it is clear from this test that the circumstances to be examined are those existing *at the time of alleged abandonment.*" (emphasis Oken's). He argues that because the hearing court based its determination of whether he abandoned Room 48 on an objective assessment of the facts presented

to the court at the time of the hearing, rather than on an evaluation of the circumstances known to the police at the time they entered Room 48, the court's ruling was error. Oken maintains that, given the circumstances known to the officers when they first entered Room 48, the evidence in this case does not support a finding of abandonment.

The State, on the other hand, contends that the hearing court properly found that Oken had abandoned Room 48 based upon an objective analysis of the circumstances known to the court at the time of the suppression hearing. It argues that Oken fails to recognize the distinction between the question of abandonment in the context of whether the Fourth Amendment is applicable versus the question of abandonment in the context of whether the Fourth Amendment has been satisfied. In the instant case, the State submits that question confronting the motions judge was whether the Fourth Amendment was applicable. It points out the fact that during the suppression hearing the prosecutor repeatedly raised the issue of whether Oken had standing to challenge the initial search of Room 48 by arguing that Oken had abandoned that room. Thus, since standing is an issue of Fourth Amendment applicability, the State contends that the proper standard of review is one based upon an objective and historical assessment of the facts known to the hearing court at the time of the suppression hearing. In support of this proposition, the State relies on our decision in *Faulkner v. State,* 317 Md. 441, 446, 564 A.2d 785, 787 (1989), where we explained:

> " 'When we shift issues from that of Fourth Amendment satisfaction to that of Fourth Amendment applicability [i.e. standing], our criteria for measuring change dramatically. The concern shifts from the merits of the litigation to the entitlement to litigate. The focus shifts from the subjective viewpoint of the policeman to the objective appraisal of the trial judge. The timeframe shifts from the moment of search or seizure to the moment of the suppression ruling. The object of the measurement shifts from reasonable appearances to his-

toric reality. What finally matters shifts from what the policeman reasonably believed out on the street to what the suppression hearing judge ultimately knows in the courtroom.' "

(quoting *Ruffin v. State*, 77 Md.App. 93, 549 A.2d 411 (1988)). The State argues that, under such an objective analysis, there was ample evidence supporting the hearing court's finding that Oken had abandoned Room 48.

■ After reviewing the record in the instant case, we agree that the State raised, and vigorously argued, the question of whether Oken had standing to contest the search of Room 48. Therefore, since the issue of standing was raised, we hold that the proper basis for the court's analysis was an objective and historical assessment of the circumstances known to the court at the time of the suppression hearing. *See Faulkner, supra*, 317 Md. at 446, 564 A.2d at 787.

■ Having concluded that the hearing court used the proper focus for its analysis, we turn to the question of whether there were sufficient facts before the hearing judge to support his finding that Oken had abandoned Room 48 before the police entered that room without a warrant at approximately 9:30 a.m. on November 17, 1987. The factual predicate for our review is that evidence adduced at the suppression hearing which is most favorable to the State as the prevailing party on the motion. *Riddick, supra*, 319 Md. at 183, 571 A.2d at 1240–41; *Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22, 22 (1990). During the suppression hearing, the State presented the following evidence: 1) only five hours after Oken checked into the Coachman, he drove for approximately an hour and a half to Freeport, Maine and checked into the Freeport Inn; 2) Oken left nothing in Room 48 except a bloody shirt, a dirty pair of socks, half a bottle of vodka, and some orange juice; 3) Oken left no luggage in Room 48; 4) from the police logs kept by the police at the Coachman it is clear that Oken did not return to the motel before approximately 1:00 a.m. on

November 17th; 5) from the testimony of the manager at the Coachman, Oken was not at the motel after 4:45 a.m. on the 17th, and there is no evidence that he returned to the Coachman between 1:00 a.m. and 4:45 a.m.; 6) the bed in Room 48 was not slept in; 7) testimony by a manager at the Freeport Inn placed Oken near the Freeport Inn some time between 10:00 a.m. and 10:30 a.m. on November 17th, at which time he paid for an additional night's lodging at the Freeport Inn. In light of such a record, we hold that the hearing judge's ruling on abandonment was not clearly erroneous.

### B.

On the issue of inevitable discovery, Oken contends that the hearing court's ruling was erroneous because the State did not meet its burden of demonstrating that "certain proper and predictable investigatory procedures would have been utilized ... and ... that those procedures would have inevitably resulted in the discovery of the evidence in question." *Stokes v. State,* 289 Md. 155, 163, 423 A.2d 552, 556 (1980) (quoting LaCount and Girese, *The "Inevitable Discovery" Rule, an Evolving Exception to the Constitutional Exclusionary Rule,* 40 Alb.L.Rev. 483, 491 (1976). *See also Nix, supra,* 467 U.S. at 444, 104 S.Ct. at 2509, 81 L.Ed.2d at 387–88. Specifically, Oken submits that the State did not show that: 1) the police would have conducted a search of Room 48 pursuant to a warrant or valid consent from the owner of the Coachman, and 2) the procedures followed by the maids in the motel would have inevitably led to the discovery of the evidence in Room 48. We disagree.

During the suppression hearing, the State called the manager of the Coachman, Diana Ott. Ott testified that, absent the initial entry by the police into Room 48, certain predictable and customary cleaning procedures would have been utilized, and would have resulted in the discovery of the items found in Room 48. She recounted that at 4:45

a.m., on the day after Lori Ward's murder, she circled the parking lot of the motel to determine which of the motel rooms that were occupied overnight were now vacant and thus ready for cleaning. Ott testified: "I drove around the parking lot. I did that routinely. I did that every morning." She then attested that had she not called Chief Strong of the Kittery police to notify him that she would be cleaning the recently occupied rooms, the cleaning crew, accompanied by her, would have started cleaning the rooms at approximately 7:00 a.m. and would have finished no later than 8:00 a.m. Ott further noted that in light of the events of the previous night, she would have picked up the shirt, and upon discovering the blood, would "immediately" have called Chief Strong. Accordingly, we conclude that the State presented ample evidence demonstrating that the items in Room 48 would have been inevitably discovered through lawful means, and therefore the motion judge's ruling was not clearly erroneous.

In holding that the hearing court's ruling on inevitable discovery was not clearly erroneous, we also reject Oken's alternative contention that the doctrine of inevitable discovery should not apply in any event because the police acted in bad faith when they searched Room 48 prior to the 11:00 a.m. checkout time. As the Supreme Court held in *Nix, supra,* 467 U.S. at 445, 104 S.Ct. at 2509, 81 L.Ed.2d at 388:

> "The requirement that the prosecution must prove the absence of bad faith ... would place courts in the position of withholding from the juries relevant and undoubted truth that would have been available to police absent any unlawful police activity. Of course, that view would put the police in a *worse* position than they would have been in if no unlawful conduct had transpired. And of equal importance, it wholly fails to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice."

(emphasis in original). *See also United States v. White-horn,* 813 F.2d 646, 649–50 (4th Cir.1987), *cert. denied,* 487

U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 931 (1988) (inevitable discovery doctrine applied to evidence discovered during illegal bomb sweep of apartment).

### IV.

We next consider the issue of whether the trial court erred in permitting Special Agent William Heilman to testify as an expert at Oken's trial on guilt or innocence. The State called Heilman to testify regarding his comparison of the piece of rubber found in Dawn Garvin's apartment and a tennis shoe seized from Oken when he was arrested. During the *voir dire* on his qualifications, Heilman testified that he worked at the Federal Bureau of Investigation ("FBI") as "an examiner of questioned documents." In addition to making comparisons or examinations of questioned documents, Heilman pointed out that he had examined shoe prints, tire tracks, plastic bags, and that he had performed torn edge comparisons of paper, tape, plastic bags, and matches. Heilman stated, however, that he had never performed a torn edge comparison with rubber.

Based on Heilman's *voir dire*, the State asked the trial court to qualify Heilman as an expert in forensic comparisons. The court declined to do so, but allowed the prosecutor to further question Heilman regarding his torn edge comparison expertise. In response to further *voir dire* examination by the State, defense counsel, and the trial court, Heilman explained that he received on-the-job training in the area of torn edge comparisons through his work at the FBI. Specifically, Heilman stated that between 1981 and 1983 he received training in a laboratory as an assistant to a senior examiner, and that after 1983 he became qualified by the FBI to conduct his own torn edge comparisons. Since 1983, Heilman testified that he had been involved in approximately 12 cases involving torn edge comparisons, and that any one case may require "thousands" of comparisons. Nevertheless, Heilman admitted that he had never testified as an expert in torn edge comparisons.

In addition to relating his experience with torn edge comparisons during the *voir dire* examination on his qualifications, Heilman described the procedures involved in conducting a torn edge comparison. He stated that, in conjunction with performing side-by-side comparisons, he would ordinarily compare the color, thickness, and microscopic line crossings of the items in question. He related that in conducting the examination of the rubber and the tennis shoe in the present case, he "made a cast of the individual area of the shoe to look at the external torn structure and compare that to the [piece of rubber]."

At the conclusion of Heilman's *voir dire* examination on his qualifications, a bench conference was held wherein the following colloquy occurred:

"[PROSECUTOR]: Judge, according—I am in the area of torn edge comparisons. I would point out to the Court that an expert only has to be one who has more experience than a layman and that is someone who can give an opinion that will be of appreciable help to the jury. Clearly, while this is the first time this person has ever done an examination with a piece of rubber, he is quite candid that he said that. There has to be a first time for all of us. There is a first time for his handwriting, too. Clearly, by his experience and knowledge and doing side-by-side comparisons in other materials, he can give help to the jury because he knows more than they do. That is all the law says. He can be of appreciable help to the jury as to what he is testifying outside the layman's normal experience. I think it is clear that his experience, training, knowledge, and on the job work goes well beyond what any normal layman can do and to allow us an opinion upon that.

"[DEFENSE COUNSEL]: He is simply trying to offer this witness to substitute his eyesight [for that] of the jury. This man is not qualified as a torn edge expert. He is certainly not qualified as an expert on rubber and he is his own—he is self-qualified, if qualified at all. The jury can look as well as I can look. He is only going to

confuse them and prejudice them that he works for the FBI and so on. He has had no further experience. I mean, what it comes down to, the State is asking this guy to tell the jury what he should find. Period. It is a matter of eyesight. They can do that as well as he can do that.

"THE COURT: Well, I think that goes to the weight that the jury will give the expert. I think that the witness has qualified as an expert to offer that which is beyond the ability of the jurors. Compare in light of the techniques that are used beyond experts in his comparisons, as to his, not only whether it matches from a side-by-side comparison or putting together composites, but also from the microscopic crossings of the lines are in a piece as compared to the shoe itself. There is expertise beyond those layman's ability to compare what this witness has in light of his training and experience as he has described it. So the objection to the witness being qualified is overruled. I would tell the witness that he is qualified and his testimony is for their determination as to its weight.

"[DEFENSE COUNSEL]: May I say this for the record? He has no validity with regard to comparing rubber pieces, torn edges or otherwise. He described his function and his method of operation as trying to put a jigsaw puzzle together. This jury is the putter together of the jigsaw puzzle in this case and this guy wants to put the puzzle together for them. That is the jury's function.

"THE COURT: I disagree. I think Counsel has made on the record as part of what the witness said, but the witness went on to say that his evaluation did show that he did the line comparison by the microscopic crossings of the lines. He can testify because only he did it and the jury does not have the facility to do that kind of testing on their own. And in light of his background with respect to paper, plastic, matches, paper and tape, his expertise exceeds that as the general layman.

"[DEFENSE COUNSEL]: I welcome Your Honor's ruling. He has shown no qualifications as a cast maker, Your Honor.

"THE COURT: You can cross-examine that.

"[DEFENSE COUNSEL]: Thank you."

Thereafter, the trial court accepted Heilman as an expert in the field of torn edge comparisons, and Heilman explained to the jury how he examined Oken's tennis shoe and the piece of rubber found in Dawn Garvin's apartment. Heilman concluded that, in his opinion, "the piece of rubber at one time was part of the sole of the known shoe."

Before us, Oken renews his objection to the trial court's ruling allowing Heilman to testify as an expert. He argues that: 1) Heilman's testimony as an expert was not relevant because it did not aid the jury in determining whether or not the piece of rubber fit the tennis shoe; and 2) assuming, *arguendo*, expert testimony was necessary, Heilman did not qualify as an expert. We perceive no error in the trial court's rulings.

■ It is well settled that "the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal." *Stebbing v. State*, 299 Md. 331, 350, 473 A.2d 903, 912, *cert. denied*, 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984) (quoting *Raithel v. State*, 280 Md. 291, 301, 372 A.2d 1069, 1074–75 (1977)). The Maryland test for admissibility of expert testimony was reviewed by this Court in *Simmons v. State*, 313 Md. 33, 41–42, 542 A.2d 1258, 1262 (1988):

"A determination as to the admissibility of expert testimony is based on several findings. First, the trial court must determine whether the evidence to be presented is a proper subject for expert testimony. The standard for relevance under Maryland common law is whether the jury will receive appreciable help from the expert testimony in resolving the issues presented in the case.

"Before expert testimony is admitted the court must also determine whether the proposed expert is qualified to testify by virtue of education and experience.

"Finally, the proposed expert testimony must be competent, that is, the expert's conclusions must be based upon a legally sufficient factual foundation. Ideally, the expert will testify from first-hand knowledge, such as that gained from a personal examination of an individual. Only with the basis for the expert testimony revealed will the jury be able to properly weigh the evidence."

(citations omitted).

■ In the present case, we believe that the record of Heilman's *voir dire* examination on his qualifications supports the trial judge's conclusions that Heilman's testimony would be helpful to the jury, and that Heilman was qualified to testify as an expert based on his FBI training. During his *voir dire* examination, Heilman testified that in addition to conducting a simple side-by-side comparison of the items in question, the procedure for making torn edge comparisons involved the examination of microscopic line crossings and the casting of moldings. Such techniques are certainly not within a juror's everyday experience and, therefore, would aid the jury in determining whether the piece of rubber found in Dawn Garvin's apartment matched the tennis shoe seized from Oken.

■ With respect to Heilman's qualifications, Heilman testified that he had received two years of experience comparing torn edges as an assistant in a laboratory for the FBI, and has been qualified by the FBI to conduct torn edge comparisons on his own for approximately seven years. During those years, Heilman stated that he was involved in at least twelve cases requiring torn edge comparisons and that each case may involve "thousands" of comparisons. Although he acknowledged that he never had occasion to make a torn edge comparison with rubber substances, Heilman stated that the technique normally used in making torn edge comparisons was utilized in the case *sub judice*. We

hold that the trial court did not abuse its discretion in permitting Heilman to testify as an expert.

V.

Next, we consider Oken's contention that there was insufficient evidence to support his convictions for burglary and first degree sexual offense. Recently, in *Wiggins v. State*, 324 Md. 551, 566–67, 597 A.2d 1359, 1366–67 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992), Chief Judge Murphy speaking for the Court reiterated the standard that we apply when reviewing the sufficiency of the evidence in a criminal case:

> "In *Tichnell v. State*, 287 Md. 695, 415 A.2d 830 (1980), an appeal in a death penalty case, we stated that the standard to be applied in reviewing the sufficiency of the evidence to support a criminal conviction was ' "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." ' *Tichnell*, 287 Md. at 717, 415 A.2d 830 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979)). This standard does not require a court to ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt" '; rather, the standard to apply is ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' *Jackson v. Virginia, supra*, 443 U.S. at 318–19, 99 S.Ct. at 2788–89 (emphasis in original). We recently restated this standard of review in these terms: ' "[T]he constitutional standard of review is 'whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " ' *Wilson v. State*, [319 Md. 530, 535, 573 A.2d 831, 833 (1990) (quoting *West v. State*, 312 Md. 197, 207, 539 A.2d 231, 236 (1988)) ]."

With this standard in mind, we separately review whether Oken's convictions for burglary and first degree sexual offense are adequately supported by the evidence.

### A.

Burglary is defined as "the breaking and entering of the dwelling house of another in the nighttime with an intent to commit a felony." *Warfield v. State*, 315 Md. 474, 493, 554 A.2d 1238, 1248 (1989); *State v. Davis*, 310 Md. 611, 617, 530 A.2d 1223, 1226 (1987). The breaking element of burglary "may be satisfied where it is shown that there has been an 'actual' breaking, or the breaking occurred 'constructively,' through an entry gained by artifice, by fraud, conspiracy, or by threats." *Brooks v. State*, 277 Md. 155, 159–60, 353 A.2d 217, 220 (1976) (quoting *Williams v. State*, 205 Md. 470, 477, 109 A.2d 89, 93 (1954)).

In the present case, Oken asserts that there was no evidence of actual or constructive breaking to support his conviction for burglary. The State, to the contrary, maintains that it presented ample evidence to establish that a constructive breaking occurred. It points to the testimony of Mark Glidden, Robert Strange, Bonnie Winkelman, Gregory Gunnell, and Burnita Wilder as establishing that on three occasions prior to, but in temporal proximity to, Dawn Garvin's murder Oken attempted to gain entry to residences by fraudulently representing to the occupant that he needed to use the telephone and, on one occasion, that Oken attempted to stop a woman who was driving alone in her car by posing as a policeman. Based upon this evidence, the State submits that the jury could have reasonably inferred that Oken employed a similar ruse to gain entry to Dawn Garvin's apartment. We are not convinced.

While it is true that we have stated that a conviction may rest on circumstantial evidence alone, *Wilson v. State*, 319 Md. 530, 536, 573 A.2d 831, 834 (1990); *Veney v. State*, 251 Md. 182, 201, 246 A.2d 568, 579 (1968), *cert. denied*, 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969), we have also explained:

"to ensure that the trier of fact bases a finding of guilt on the appropriate degree of certainty, ... a conviction [based] upon circumstantial evidence *alone* is not to be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence."

*Wilson, supra,* 319 Md. at 536–37, 573 A.2d at 834 (emphasis in original), and cases cited therein.

 Here, aside from the evidence of ruses employed by Oken in connection with the entry or attempted entry of other residences in the neighborhood of the victim's apartment, the record is completely devoid of any evidence showing a breaking, either actual or constructive, of Dawn Garvin's apartment. Consequently, we are not convinced that a jury could find such circumstantial evidence inconsistent with any reasonable hypothesis that the victim's apartment was entered by Oken without a constructive breaking. Therefore, we hold that Oken's conviction for burglary must be reversed. Since our reversal is based on the lack of sufficient evidence to sustain Oken's conviction, he cannot be retried for that alleged burglary. *Warfield v. State, supra,* 315 Md. at 502, 554 A.2d at 1252 (1989).

## B.

As to Oken's conviction for the crime of first degree sexual offense, Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 464(a) provided:

"A person is guilty of a sexual offense in the first degree if the person engages in a sexual act:

(1) With another person by force or threat of force against the will and without the consent of the other person, and:

(i) Employs or displays a dangerous or deadly weapon or an article which the other person reasonably concludes is a dangerous or deadly weapon; or

(ii) Inflicts suffocation, strangulation, disfigurement, or serious physical injury upon the other person or upon anyone else in the course of committing the offense; or

(iii) Threatens or places the victim in fear that the victim or any person known to the victim will be imminently subjected to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnapping; or

(iv) The person commits the offense aided and abetted by one or more other persons."

A "sexual act" as used in this subsection was defined in Art. 27, § 461(e) to include the "penetration, however slight, by any object into the genital or anal opening of another person's body if the penetration can be reasonably construed as being for the purpose of sexual arousal or for abuse of either party...." Although Oken acknowledges that the victim was found with a bottle inserted into her vagina, he argues that the State presented no evidence at trial from which a rational juror could conclude, beyond a reasonable doubt, that Dawn Garvin was alive when the bottle was inserted into her vagina. We disagree.

In addition to the fact that Dawn Garvin was found nude lying on her bed in her bedroom with a bottle protruding from her vagina, there was also evidence that: 1) her clothing was found strewn about the living room floor; 2) her brassiere was not unfastened, but instead was ripped on the side; 3) her pants were found turned inside out, and 4) a search of Oken's home on November 16, 1992, revealed a list in Oken's handwriting which included the following items:

"gauze pads; 5 by 11 inches by 4 inches, chloroform, N25B, gag; sock and adhesive tape, two inches by five inches by five yards; surgical gloves from the store, camera; come, [sic] film and flash; store; panty hose, dark color to cover hair and face; reading glasses; dildos; vibrators; et cetera, possible capsules, glass covers, store."

From this evidence a permissible inference can be drawn that the victim resisted the commission of a sexual act upon

her by Oken who had come prepared to forcibly perpetrate sexual offenses upon a live victim whom he might have to immobilize by binding and gagging. In light of that permissible inference, we believe that a rational trier of fact could have concluded beyond a reasonable doubt that Dawn Garvin was still alive when Oken inserted the bottle into her vagina. *Cf. Hines v. State,* 58 Md.App. 637, 665–66, 473 A.2d 1335, 1348–49 (1984). Accordingly, we shall uphold Oken's conviction for first degree sexual offense.

### C.

Oken also suggests that his conviction of first degree murder under the theory of a felony murder is invalid because it is impossible to determine whether the jury relied on burglary as the predicate felony in reaching that verdict. Consequently, he argues that his conviction of felony murder must be reversed. This argument has no relevance to what actually occurred in the trial court.

The jury in finding Oken guilty of first degree murder expressly based its verdict on both the deliberate and premeditated killing of the victim and upon the felony murder theory. The jurors so indicated on the verdict sheet which they completed prior to announcing their verdicts. Oken was also found guilty of burglary, first degree sexual offense and the use of a handgun in the commission of a crime of violence. Consequently, Oken was subject to punishment for first degree murder as well as for the felonies of burglary and first degree sexual offense. *State v. Frye,* 283 Md. 709, 722–23, 393 A.2d 1372, 1379 (1978).

At the sentencing stage of the proceedings on the first degree murder conviction, the State sought the death penalty based upon only one of the aggravating circumstances required by Art. 27, § 413(d), i.e., that Oken committed the murder while committing or attempting to commit a sexual offense in the first degree. In his instructions to the sentencing jury, the trial judge admonished the jurors:

"Now, before a death sentence can be considered by you, the first-degree murder must have been accompanied

by the aggravating circumstance alleged by the State. Now, the only aggravating circumstance which you may consider is the first degree sexual offense, not the burglary or not the handgun violation. The State alleged as its aggravating circumstance the first-degree sexual offense. Now, a finding that the aggravating circumstance as alleged by the State in this case exists must be unanimous by you."

In their verdict that the death penalty should be imposed upon Oken for first degree murder, the jurors expressly found that the sole aggravating circumstance relied upon by the State had been proven beyond a reasonable doubt.

After the sentence of death was imposed by the jury, the court sentenced Oken for the remaining crimes of which he had been convicted by the jury. At that sentencing the following colloquy occurred between the trial judge and defense counsel:

"THE COURT: Now, with respect to the balance of the counts, is the defense prepared?

"[DEFENSE COUNSEL]: Yes, Your Honor, I would move to merge the two murder convictions and I would move to merge everything into the existing conviction on the first count, Your Honor.[8]

"THE COURT: Well, the two murder convictions—there's only going to be one sentence under count one. That's a sentence of death.

"[DEFENSE COUNSEL]: But there were two convictions, Your Honor.

"THE COURT: Right. Well, it was one conviction under two theories. But if it will, if you think I have to clarify the record, the felony murder conviction will merge into the premeditated murder conviction for sentencing purposes."

Thus, the record clearly reflects that Oken was never sentenced for first degree murder under the felony murder

---

8. We do not endorse the theory that this was a merger situation.

theory; accordingly, the issue which Oken attempts to present was never generated in the trial court.

## VI.

Oken next claims that the trial court erred in admitting certain identification testimony of Detective Robert Capel. Detective Capel was called by the State during Oken's trial on guilt or innocence. On direct examination, Detective Capel recounted that the witnesses who previously testified concerning Oken's attempts to gain entry into their residences by fraudulently representing that he needed to use the telephone, and in one woman's case, that Oken had attempted to stop her car by posing as a policeman, had identified Oken from photographic arrays as the perpetrator of these ruses. On cross-examination, defense counsel asked Detective Capel who else in addition to the four individuals identified on direct examination had seen the photographic arrays. The detective responded that, apart from "Debbie Hime," who was the babysitter for one of those individuals, "a Helen Hollingsworth and a Ms. Jane Watkins" also saw the arrays. Following that cross-examination, the following redirect examination ensued:

"[PROSECUTOR]: Just a couple questions. And Ms. Watkins to whom you showed the photo array, what incident, what date was her incident?

"[WITNESS]: Well, it was—

"[DEFENSE COUNSEL]: Not incident, but date?

"[PROSECUTOR]: That is correct.

"[WITNESS]: It was November 3, 1987.

"[PROSECUTOR]: Okay. And Ms. Hollingsworth to whom you showed photos?

"[WITNESS]: That was before this incident. I believe that was summer, July. You want me to check the date?

"[PROSECUTOR]: No, that is okay.

"[WITNESS]: Well, it was July.

"[PROSECUTOR]: Debbie Hime?

"[DEFENSE COUNSEL]: That is the one that he is talking about.

"[WITNESS]: No, sir.

"[PROSECUTOR]: Debbie Hime was Mr. Gunnell's baby-sitter?

"[WITNESS]: Yes.

"[DEFENSE COUNSEL]: Did we get a date?

"[PROSECUTOR]: Do you recall what date that something—that occasioned you to show her photos?

"[WITNESS]: Yes, that was before November 1st. I believe it was the 28th when the incident happened to her.

"[PROSECUTOR]: And did Ms. Watkins and Ms. Hollingsworth make an identification?

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Overruled.

"[WITNESS]: Yes, they did.

"[PROSECUTOR]: And that is all I have on re-direct.

"THE COURT: Any re-cross?

"[DEFENSE COUNSEL]: None, Your Honor. No, I do. Who decided which identifications you would talk about today [you] or someone else?

"[WITNESS]: I'm afraid I do not understand.

"[DEFENSE COUNSEL]: Who decided that you would refer to the identifications of Mr. Strange, Ms. Wilder, Mr. Gunnell and Mr. Glidden today? Did you make that decision?

"[WITNESS]: No, sir.

"[DEFENSE COUNSEL]: Thank you.

"[PROSECUTOR]: Nothing further."

Before us, Oken argues that the trial court's admission of the State's "entire line of questioning" on redirect examination of Detective Capel constituted reversible error. Specifically, Oken argues that the admission of evidence that he had been "identified" by Ms. Hollingsworth and Ms. Watkins was: 1) irrelevant to any disputed issue in the case; 2) prejudicial because it amounted to "other crimes" evidence; 3) inadmissible hearsay; and 4) violative of his Sixth

Amendment right to confrontation because "Ms. Hollingsworth and Mr. Watkins were in a significant sense [his] accusers." The State replies that "Oken's challenge to the prosecutor's 'entire line of questioning' on redirect [was] in large measure waived," and, in any event, all of Oken's substantive arguments fail under the theory of "opening the door."

■ Generally speaking, the scope of examination of witnesses at trial is a matter left largely to the discretion of the trial judge and no error will be recognized unless there is clear abuse of such discretion. *Trimble v. State,* 300 Md. 387, 401–02, 478 A.2d 1143, 1150 (1984), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985). With respect to the scope of redirect examination, it is well settled that:

> "As a general rule, redirect examination must be confined to matters brought out on cross-examination. However, it is within the court's discretion to allow the introduction of something new or forgotten if the purposes of justice seem to demand it, and this Court will not interfere unless there is a clear abuse of such discretion."

*Id.* [300 Md.] at 402, 478 A.2d at 1150 (quoting *Fisher Body Division v. Alston,* 252 Md. 51, 56, 249 A.2d 130, 133 (1969)); *Zipus v. United Rys. & Elec. Co.,* 135 Md. 297, 303, 108 A. 884, 886 (1919); *Blake v. Stump,* 73 Md. 160, 167, 20 A. 788, 790 (1890); *Feeney v. Dolan,* 35 Md.App. 538, 548–49, 371 A.2d 679, 685–86, *cert. denied,* 280 Md. 730 (1977); *Bailey v. State,* 16 Md.App. 83, 110–11, 294 A.2d 123, 138–39 (1972); *Mills v. State,* 12 Md.App. 449, 461, 279 A.2d 473, 481–82 (1971), *cert. denied,* 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 666 (1972).

■ Here, the record reflects that defense counsel's cross-examination of Detective Capel opened the door to the prosecutor's questions pertaining to the identifications made by Ms. Hollingsworth and Ms. Watkins. During Oken's cross-examination of Detective Capel, defense counsel asked Detective Capel, "How many people altogether

did you show [the] display to," and, specifically, who besides the four individuals identified on direct examination saw the photographic arrays. In asking these questions, defense counsel clearly implied that photographic arrays were viewed by more people than those identified on direct examination, and that these other people could not identify Oken.

On redirect examination, the prosecutor merely responded to the implication made by defense counsel on cross-examination by eliciting that the Hollingsworth and Watkins incidents were not developed in the State's case because they were not as contemporaneous with Dawn Garvin's murder as were the incidents involving the witnesses who were called. Therefore, since Oken raised the Hollingsworth and Watkins issue on cross-examination, we hold that he "cannot now be heard to complain that the State sought to rebut its significance." *Trimble, supra*, 300 Md. at 403, 478 A.2d at 1151.

■ Finally, we reject Oken's contention that the prosecutor's redirect examination of Detective Capel constituted "other crimes" evidence. Even assuming, *arguendo*, that the witness had testified that Ms. Hollingsworth and Ms. Watkins had identified Oken, the most such testimony would have suggested was that on yet two more occasions Oken may have engaged in behavior similar to that recounted in connection with the four other witnesses, none of whom testified that Oken was engaged in criminal behavior.

### VII.

We next consider Oken's assertion that the trial court erred in permitting the State to refresh the recollection of a witness in the absence of an adequate foundation. During the State's case on the issue of Oken's guilt or innocence, the prosecutor called Mark Glidden to the witness stand to establish, *inter alia*, that on the night of Dawn Garvin's murder Oken: 1) gained entry to Glidden's apartment by asking to use the telephone, and 2) left his apartment,

walking in the direction of Dawn Garvin's apartment building. On direct examination, Glidden initially stated that he lived at 23 Lincoln Woods Apartments and the building he saw Oken walking toward was 25 Lincoln Woods Apartments. The prosecutor asked Glidden if he was "sure about the apartment," and Glidden replied, "Yes." Later, before the State concluded its direct examination of Glidden, the following exchange between the prosecutor and Glidden took place:

"[PROSECUTOR]: Now, how long have you lived at the present address that you just gave?

"[WITNESS]: Lincoln Woods?

"[PROSECUTOR]: No, the one that you live in now?

"[WITNESS]: A year.

"[PROSECUTOR]: It was prior to that that you lived in Lincoln Woods?

"[WITNESS]: Yes.

"[PROSECUTOR]: I am going to show you just a copy of a county police report and ask you if this refreshes your recollection about the number of the building that you lived in?

"[DEFENSE COUNSEL]: I object to that, Your Honor.

"THE COURT: Overruled.

"[WITNESS]: Oh, 25 Lincoln Woods, right.

"[PROSECUTOR]: Does that refresh your recollection?

"[WITNESS]: Yes, I was nervous. I made a mistake, sorry.

"[PROSECUTOR]: Just to clear it up so there is no question about it, what was the number of the apartment building that you lived in?

"[WITNESS]: 25.

"[PROSECUTOR]: Okay. And it was apartment 1B?

"[WITNESS]: Yes.

"[PROSECUTOR]: When the Defendant left, where did he go? Did you see him leave your apartment?

"[WITNESS]: Yes, I watched him.

"[PROSECUTOR]: Where did you see him go?

"[WITNESS]: Across to the other side.

"[PROSECUTOR]: Okay. Toward what building?

"[WITNESS]: 23.

"[PROSECUTOR]: And do you know what time that was, approximately what time that evening?

"[WITNESS]: Around 9:30.

"[PROSECUTOR]: I have no further questions."

Oken argues that the trial judge's ruling permitting the State to refresh Glidden's recollection without first establishing that Glidden had some failure of memory was error. In support of this contention, Oken highlights the fact that Glidden initially testified that he was "sure" of his recollection. Oken contends that, because the point upon which Glidden's memory was refreshed was an important one, i.e., that a man whom he identified as Oken was heading toward Dawn Garvin's building and not some other building on the night of Ms. Garvin's murder, the trial court's ruling was prejudicial error. We disagree.

■■■ While it is true that in many circumstances, an examining attorney must first establish that a witness's memory is exhausted before refreshing the recollection of that witness, *see* 6 L. McLain, *Maryland Evidence* § 612.1 (and cases cited therein), laying such a foundation is not an absolute prerequisite. Instead, the question of whether a witness's recollection may be refreshed by a writing or some other object depends upon the particular circumstances present in each case, and therefore, is committed to the sound discretion of the trial judge. *Bankers Trust Co. v. Publicker Industries, Inc.,* 641 F.2d 1361, 1363 (2d Cir.1981) ("There is no required, ritualistic formula for finding exhaustion of memory.") *State v. Greenlee,* 72 N.C.App. 269, 324 S.E.2d 48, 51–52 (1985) (prosecuting attorney did not improperly impeach State witness merely by attempting to refresh her memory upon realizing that her in-court testimony was contradictory to her prior statement); *Walker v. State,* 445 So.2d 955, 957 (Ala.Crim.App.

1983) (witness for State in a rape prosecution could refer to a writing for purpose of refreshing his recollection without first, as condition precedent, showing that it was necessary for his recollection to be refreshed); *Reproductive Health Services, Inc. v. Lee,* 660 S.W.2d 330, 335–36 (Mo.App.1983) (holding that "where witness' testimony concerned five separate incidents of trespassing over a period of approximately ten months, involving various defendants, . . . trial court could, in the exercise of its discretion, permit witness to employ written list to refresh her recollection without any specific statement on her part that she needed the list to refresh her recollection."); *People v. Verodi,* 150 Cal. App.2d 137, 150–51 309 P.2d 568, 576–77 (2d. Dist.1957) (holding that "in murder prosecution, district attorney's referring witness' attention to memorandum, previously prepared by witness, for purpose of refreshing witness' recollection and correcting a perfectly obvious omission was proper, even though witness had stated prior to seeing memorandum, that he had testified to everything which had been and that he did not need the memorandum to refresh his recollection."); C. McCormick, *Evidence* § 9 at 33–34 (4th ed. 1992) ("The witness may believe that she remembers completely but on looking at the memorandum she would be caused to recall additional facts. As the Chinese proverb has it, 'The palest ink is clearer than the best memory.' On the other hand, there is the ever-present danger that a suggestible witness may think that she remembers a fact because she reads it. It seems eminently a matter for discretion, rather than rule."); 3 J. Wigmore, *Evidence* § 765 at 145 (Chadbourn rev. (1965)) ("The forgoing rules [on present recollection revived] should not be treated as dogmas of inherent efficiency. They are merely crude rules-of-thumb, worthy of the adoption for the general purpose. . . . The trial court's discretion should control.") 6 L. McLain, *Maryland Evidence* § 612.2 (under Rule 612 of the Federal Rules of Evidence, "[o]nce a witness has been asked to testify or testified to a certain matter, if the

witness' memory appears to be incorrect or incomplete, counsel may attempt to refresh the witness' recollection.").

In the instant case, we hold that the trial court did not abuse its discretion in allowing the State to refresh Glidden's recollection for several reasons. First, it is clear from the record that all of the participants at the trial, including defense counsel, had reason to believe Glidden's initial testimony on direct examination regarding the building numbers was erroneous. At a pre-trial suppression hearing, Glidden correctly testified that he lived in Building 25, and that the building he saw Oken walking toward was number 23. In addition, Keith Garvin testified at the same suppression hearing that he and his wife, Dawn, lived in Building 23.

Second, the record reflects that it was Glidden's revived testimony that came into evidence, and not the police record itself. Specifically, the prosecutor asked Glidden if the writing refreshed his memory. Glidden replied: "Yes, I was nervous. I made a mistake, sorry."

Finally, the record reflects that the State did not use the document to refresh Glidden's memory in order to get into evidence otherwise inadmissible evidence, for at no time did the prosecutor ever attempt to introduce the police report into evidence.

## VIII.

Oken next submits that the trial court erred in failing to restrain allegedly improper closing arguments by the prosecutor. Specifically, Oken contends that several remarks made by the State's Attorney during closing argument were improper because they focused on Oken's demeanor during his trial on guilt or innocence. The first allegedly improper remark occurred during the prosecutor's initial closing argument. While reciting to the jury why, in the State's estimation, Oken should be convicted, the prosecutor concluded:

"And finally is the defendant's demeanor during the trial. You all can consider that for what you think that is worth and how that weighs on the evidence."

The second remark was made during the State's rebuttal. There, the prosecutor commented:

"Members of the jury, my final words. I think that this crime can best be summarized by just a little saying and that is, looks are deceiving. He sat over here for two weeks taking notes, talking to his lawyer, smugly looking at all of us, listening to the judge, listening to the evidence but looks are deceiving, ladies and gentlemen, because it's the person within. It's the monster within."

Although Oken acknowledges that he made no objection to these remarks, he nonetheless maintains that we should review the issue based upon the Court of Special Appeals's holding in *Holbrook v. State*, 6 Md.App. 265, 250 A.2d 904 (1969).

We note at the outset that Oken's reliance on *Holbrook supra*, is misplaced. In *Holbrook*, the defendant, unlike Oken, preserved his contention that the prosecutor's closing remarks were improper by making a motion for a mistrial at the conclusion of the prosecutor's remarks. The intermediate appellate court reasoned that:

"Although it may be better for defense counsel to object when the statement is made during argument, we think that objection is timely when brought to the attention of the trial court when it has a reasonable opportunity to correct the situation at the conclusion of the argument."

*Id.* at 271, 250 A.2d at 907 (footnote omitted). In the instant case, Oken made no objections to the prosecutor's remarks at any time.

In any event, we believe that the State's closing arguments quoted above furnish no grounds for reversal. *Jones v. State*, 310 Md. 569, 530 A.2d 743 (1987), *judgment vacated and remanded on other grounds*, 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916, *sentence vacated on other grounds*, 314 Md. 111, 549 A.2d 17 (1988). In *Jones*, the defendant, like Oken in the present case, argued that the

prosecutor's closing argument was improper because certain comments made by the prosecutor directed the jury's attention to the defendant's physical characteristics and demeanor. *Id.* [310 Md.] at 579, 530 A.2d at 748. Before ruling on the merits of the defendant's claim, we recounted the rules guiding an appellate court when reviewing the propriety of a prosecutor's closing argument. We explained:

> "counsel is afforded wide latitude in presenting closing summation to the jury. The prosecutor is allowed liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom. Accordingly, counsel 'may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions ... [and is] free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments.' "

*Id.* at 580, 530 A.2d at 748 (quoting *Wilhelm v. State*, 272 Md. 404, 412–13, 326 A.2d 707, 714 (1974)) (citations omitted). Although we cautioned that a prosecutor should not make remarks calculated to unfairly prejudice the jury against the defendant by commenting on matters not disclosed by evidence presented during the case, we declared that:

> "the mere fact that a remark made by the prosecutor to the jury was improper does not necessarily require a conviction to be set aside. Reversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused."

*Id.* (citations omitted). *See also Hunt v. State*, 321 Md. 387, 434–35, 583 A.2d 218, 241 (1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991).

Applying these rules to the facts in *Jones,* we held that the prosecutor's remarks did not constitute grounds for reversal. We reasoned that: 1) the prosecutor's remarks "were fairly drawn from the evidence" at trial; 2) the

jurors had the opportunity to observe the defendant throughout the course of the trial, and, therefore, were free to make their own independent evaluation of the defendant's demeanor; and 3) the jury was instructed by the court not to consider closing arguments made by the prosecutor as evidence. *Jones, supra,* 310 Md. at 581, 530 A.2d at 749.

In the instant case, the jurors observed Oken throughout the course of the trial, and were free to reach their own independent conclusions regarding his demeanor. The jurors were also instructed by the trial judge that the opening and closing arguments of counsel were not to be considered as evidence. Moreover, the record reflects that the evidence presented in this case fairly supported the prosecutor's remarks concerning Oken's demeanor. During the trial, ample evidence was presented concerning the heinous nature of Dawn Garvin's murder. In addition, several witnesses testified on the subject of Oken's deceiving appearance: two witnesses described him as appearing "clean-cut," while another opined that Oken "looked like a youthful college student." Therefore, we hold that the prosecutor's comments made during closing arguments do not warrant reversal.

## IX.

Oken's final contention is that his right to knowingly and voluntarily elect between a jury sentencing or a court sentencing was impermissibly burdened by an Executive Agreement between Governor William Donald Schaefer of Maryland and Governor John R. McKernan, Jr., of Maine. In that document, the governors agreed that Oken would be returned to the State of Maine:

> "in the event that Steven Howard Oken is acquitted in the Courts of the State of Maryland or the prosecution in the State of Maryland is concluded or terminated for any reason but not limited to, A, the defendant is found to be not competent to stand trial, or B, the defendant is found not criminally responsible, or C, the defendant is found guilty and receives a sentence of life or a term of incar-

ceration of less than life, or D, any conviction of Steven Howard Oken is pardoned by the executive authority of Maryland, or E, any sentence imposed on Steven Howard Oken is commuted to a term of years of less than life without parole."

According to Oken, the existence of such an agreement, of which the trial judge was aware, had the effect of discouraging him from exercising his right to a court sentencing pursuant to Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 413(b)(3) and Maryland Rule 4–343(c). Specifically, Oken argues that, "because the trial judge knew that a sentence of less than life without parole would result in [Oken's return] to Maine, it is possible that the [trial] judge, desiring that [Oken] remain in Maryland's prison system, would impose a sentence which, under the agreement, would require [Oken] to remain in Maryland—i.e. death or life imprisonment without parole. Given such circumstances, Oken submits that his election of a jury sentencing was truly involuntary. We disagree.

▇▇▇ Oken's contention is based on nothing more than sheer speculation about what the trial court *might* have done. He has provided this Court with no support in the record demonstrating that the Executive Agreement had any effect whatsoever on his election of jury sentencing, and, in fact, he asks us to presume that the trial judge would have deviated from proper sentencing procedure. In the instant case, the Executive Agreement or the fact of its existence was not admissible in evidence at sentencing. Indeed, during the pre-trial hearing of motions, the trial judge informed Oken that "the Executive Agreement, at least from the State's perspective, is not going to get before the jury." Accordingly, we hold that Oken's contention is meritless.

## X.

Finally, although Oken does not brief or argue the issue, we are required by Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 414(e)(4) to determine:

"Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." [9]

In making this determination, we consider most significant certain facts concerning Oken and the murder of Dawn Garvin.

▇▇▇ At the time of Dawn Garvin's murder, Stephen Howard Oken was 25 years old. Prior to his conviction for the murder of Dawn Garvin, Oken had also been convicted of the murder of Lori Ward in Maine.[10] During the sentencing proceeding, a psychiatrist retained by Oken as an expert testified on cross-examination that Oken had volunteered to him the following account of how he killed Dawn Garvin:

"I was told by Mr. Oken that he approached the victim outside the apartment, asked if he could use the phone, made his way into her apartment, looked about, shut the door, took out a gun and asked that she get undressed. He asked her to begin masturbating. He masturbated. At the same time he then asked her to get up and perform oral sex on him. He then pushed her back. He got on top of her, he tried to have intercourse, he did this in different positions, including anal sex. He got up at some point, went into the kitchen, brought back a bottle, Durkee's hot sauce bottle, which he said he inserted into her vagina. He made her take the bottle in and out. He was masturbating at the same time. He became angry because he couldn't reach climax and then he killed her."

The victim died as a result of two gunshot wounds to the head. The jury found as an aggravating factor that Oken committed the murder while committing or attempting to commit a first degree sexual offense. With respect to the statutory mitigating circumstances, the jury was not able to

---

**9.** By Ch. 331 of the Acts of 1992, this determination will no longer be required in appeals heard after October 1, 1992.

**10.** Oken has also been convicted of the murder of Patricia Hirt, but that conviction did not occur until after the trial for his murder of Dawn Garvin.

unanimously agree that any existed. Nevertheless, one or more of the jurors, but fewer than all 12, did find the following mitigating circumstances to exist:

"1) Fact of an existing life sentence

2) sexual sadism

3) substance abuse"

Our review of similar cases reveals that death sentences have been imposed in a number of cases where the aggravating circumstance of the murder was that the defendant committed it while committing or attempting to commit a sexual offense in the first degree upon the victim. See, *e.g.,* *Bowers v. State,* 306 Md. 120, 507 A.2d 1072 (1986); *Trimble v. State,* 300 Md. 387, 478 A.2d 1143 (1984), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985); *Stebbing v. State,* 299 Md. 331, 473 A.2d 903, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984). Considering Oken and the heinous nature of his crime, we conclude that the death sentence was neither excessive nor disproportionate. We are also satisfied that his death sentence was not imposed under the influence of passion, prejudice or any arbitrary factors. Md.Code, (1957, 1992 Repl.Vol.), Art. 27, § 414(e)(1).

CONVICTION AND SENTENCE FOR BURGLARY REVERSED; ALL OTHER JUDGMENTS AFFIRMED.

Concurring and dissenting opinion by McAULIFFE, J., in which MURPHY, C.J., and RODOWSKY, J., join.

Concurring and dissenting opinion by ROBERT M. BELL, J.

McAULIFFE, Judge, concurring in part and dissenting in part.

I concur with the Court's judgment affirming Oken's convictions for first degree murder, first degree sexual offense, and the use of a handgun in the commission of a crime of violence. I dissent, however, from the reversal of Oken's conviction for burglary. The Court holds that there

was insufficient evidence to support the burglary conviction, finding that the record in this case is "completely devoid of any evidence" showing a constructive breaking of Dawn Garvin's apartment. I disagree.

The Court correctly states that in reviewing a jury's verdict for sufficiency of evidence, our task is to decide "whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Wiggins v. State,* 324 Md. 551, 567, 597 A.2d 1359 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992). I find that this standard is met, indeed surpassed, by the State's evidence showing that Oken effected a constructive breaking of Dawn Garvin's home on the night he murdered her.

A constructive breaking can occur when an entry is gained by artifice, fraud, conspiracy, or threats. *Brooks v. State,* 277 Md. 155, 159–60, 353 A.2d 217 (1976); *see also Perkins on Criminal Law,* 194–95 (2d ed. 1969). As the Court acknowledges, the "constructive breaking" element of Oken's burglary conviction, as with any element of an offense, may stand on circumstantial evidence alone. *Wilson v. State,* 319 Md. 530, 536, 573 A.2d 831 (1990); *Veney v. State,* 251 Md. 182, 201, 246 A.2d 568 (1968), *cert. denied,* 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969). Indeed, in a case such as this where the defendant is accused not only of committing burglary but also of murdering his victim, circumstantial evidence of a constructive breaking may be all that exists.

The State produced evidence of four incidents close in time and location to the murder in this case. The first three incidents involved attempts by Oken to gain entry to residences by claiming that he needed to use the telephone, and the fourth involved Oken's attempt to stop a woman driving alone by posing as a police officer.

First, Mark Glidden testified for the State that at 9:30 p.m. on 1 November 1987, the same evening Garvin was

murdered, a man knocked on his apartment door and, as Glidden began to open the door, immediately started to come in. The man, later identified by Glidden as Oken, said that he had had a fight with his wife, and she had locked him out. Oken used the telephone and walked out, heading toward Garvin's apartment building across the street. At trial, Oken's wife testified that she was not in town on the date of this incident.

Second, Bonnie Winkleman testified that on the evening of 27 October 1987 a man knocked on the door of her apartment, located about 1000 feet from Garvin's apartment, claiming he needed to use the telephone. Winkleman told the man she would let him in as soon as she finished changing her clothes. The man, later identified as Oken, began cursing and screaming and continued to knock on her door. Winkleman became frightened and telephoned a friend, Robert Strange, who came to her apartment. Strange told Oken that he would not be allowed into Winkleman's apartment; Oken then left.

Third, Gregory Gunnell testified that at 2:30 a.m. on 20 October 1987, a man knocked on the door of his apartment, located approximately one-half mile from Garvin's apartment, and told him that he was a doctor who needed to use the telephone. The man, later identified by Gunnell as Oken, also said he lived in the same building, which Gunnell doubted since he knew all his neighbors. Gunnell did, however, allow Oken to use the telephone and testified that the conversation had something to do with a prescription.

Fourth, Burnita Wilder testified that while driving at approximately 10:00 p.m. on an evening in late October, a man in another vehicle pulled up beside her car and tried to get her to pull over by flashing his lights, showing a police patch, and yelling. When Wilder pulled over in front of a shopping center, the man, later identified by Wilder as Oken, said, "Don't you know when a policeman tells you to pull over, you pull over?" Oken then told Wilder to drive over to a part of the shopping center parking lot that was dark. Wilder instead drove to a well-lighted area and asked

Oken to show a police badge. When he showed her the cloth police patch, she pointed out that it was not a badge, to which he responded, "Oh, shit, I forgot my badge." Wilder quickly left her car and went into a convenience store. Oken drove away.

This evidence demonstrated to the jury that on at least four recent occasions Oken lied and sought access to individuals by identifying himself as a police officer or a doctor, or by claiming to have just fought with his wife when she was in fact out of town. Furthermore, the State produced a shopping list written in Oken's own hand listing gauze pads, chloroform, gag, adhesive tape and other items suggesting that Oken intended to surprise and forcibly subdue his intended victim. Moreover, the jury could consider Oken's actual conduct toward Dawn Garvin, and infer from that his criminal intent as he approached her apartment. The clear picture presented is of Oken, bent on criminal assault, with very recent practice and experience in, and proclivity toward, gaining access by trick or fraud. Oken neither contests these facts nor offers alternative explanations of his prior ruses.

No evidence suggested that Oken somehow knew Garvin and legitimately gained access to her home. While such an explanation could be imagined, our task is not to explore whether there is any remote possibility that the jury was wrong.

The evidence in this case, when considered in the light most favorable to the prosecution, supported the finding of the jury beyond a reasonable doubt that during the prior incidents Oken searched for possible victims, and used a similar kind of ruse to gain entry to Dawn Garvin's apartment, thus effecting a constructive breaking into her home. I would therefore affirm Oken's burglary conviction.

MURPHY, C.J., and RODOWSKY, J., join in this opinion.

ROBERT M. BELL, Judge, concurring and dissenting.

I concur with the Court that petitioner Stephen Howard Oken's convictions for first degree murder, first degree

sexual offense and use of a handgun in the commission of a crime of violence should be affirmed. I also agree with its reversal, for insufficient evidence, of his burglary conviction. For the reasons that follow, however, I dissent from the Court's judgment as it relates to the sentencing proceeding.

Maryland Code (1957, 1987 Repl.Vol.) Art. 27, § 413(k)(2), the statute in effect when the murder of which the petitioner was convicted and for which he was sentenced to death, provided:

> If the jury, within a reasonable time, is not able to agree as to whether a sentence of death shall be imposed, the court may not impose a sentence of death.

The petitioner requested that the jury be instructed as follows:

> I advise you that if for any reason you are unable within a reasonable period of time to reach a unanimous judgment as to the balancing required by Section ___ of the form, I will sentence Stephen H. Oken to life imprisonment.[1]

The court refused to do so.[2] Instead, the court walked the jury through the sentencing form, pointing out the

---

**1.** Petitioner's jury instruction was apparently based on the 1982 version of Maryland Code (1957) Art. 27, § 413(k)(2), which provided:
> If the jury, within a reasonable time, is not able to agree as to sentence, the court shall dismiss the jury and impose a sentence of imprisonment for life.

The difference between the 1982 version and the 1987 version is undoubtedly due to the passage of Chapter 237, Laws 1987, effective July 1, 1987, which added a sentencing option, life imprisonment without the possibility of parole, to be considered with death and life with possibility of parole, See Md.Code (1957, 1987 Repl.Vol.) Art. 27, § 413(e)(4). The language change makes clear that the only restriction imposed on the judge when a sentencing jury cannot agree as to death, is that he or she not sentence the defendant to death.

**2.** The petitioner asserts that the issue is preserved for appellate review. Although it does not appear that it was recorded, he suggests, by reference to a chambers' conference, that the issue was raised and discussed there. His objection was preserved, he says, by virtue of the court's statement that all issues raised at the chambers' conference

issues which the jury was required to resolve unanimously, as well as those which it was not, as a prerequisite to proceeding from one section of the form to the next. Toward the end of the instructions, for example, the court instructed the jury that its determination of whether the aggravating circumstance alleged by the State to exist outweighed the mitigating circumstances the jury might

---

were preserved. The State does not dispute that the issue is preserved. It maintains, rather, that the proposed instruction properly was rejected because it "in fact did not conform to § 413(k)(2), and indeed was affirmatively misleading." It also believes, for the reasons stated by the majority, *see infra,* that the issue has previously been resolved against the petitioner.

The non-conformity to § 413(k)(2) of the proposed instruction is reflected, according to the State, in the fact that it is premised upon the law that existed prior to the Legislature's addition of life imprisonment without possibility of parole as an additional sentencing option for the jury. Because, in this case, the jury was instructed as to three, rather than two, sentencing options, had it been unable unanimously to agree that death should not be imposed, deliberations to choose between simple life and life without parole would still have been required. It is the reference to only a sentence of imprisonment for life, presumably, life imprisonment with possibility of parole, which the State believes renders the instruction not only incorrect, but, misleading. It cites *Henry v. State,* 324 Md. 204, 248–49, 252, 596 A.2d 1024, 1046 (1991) and *Hunt v. State,* 321 Md. 387, 405, 583 A.2d 218, 227 (1990), *cert. denied, sub nom., Hunt v. Maryland,* —— U.S. ——, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991) as standing for that proposition.

I continue to be of the view that a trial judge's role in propounding jury instructions encompasses more than reviewing the proposed instructions for error or to determine whether they are misleading. *See Clark v. State,* 80 Md.App. 405, 411–15, 564 A.2d 90, 94 (1989). *See also Glover v. State,* 88 Md.App. 393, 398, 594 A.2d 1224, 1227 (1991). When proposed instructions address issues properly to be decided by the jury, even though they are not totally accurate, the court nevertheless is required to instruct the jury on those issues even if it may have to make changes to ensure that the instructions it does give are fully reflective of the law. Criminal trials, and especially capital sentencing proceedings, are not games. Thus, even though the proposed instruction in this case was technically erroneous—although it addressed only the court's lack of power to impose a death sentence when the jury cannot agree unanimously that it is the proper sentence and did not fully take account of all of the sentencing options available to the jury—I fail to see how it was misleading. It certainly was not incapable of correction so as to provide the jury with both a complete *and* accurate picture of the situation. In my view, technical inaccuracy of the proposed instruction did not relieve the court of its obligation accurately to instruct the jury on so critical a point.

find must be unanimous; "[u]ntil all 12 of you agree on whether the answer is 'Yes' or 'No', do not go onto Section V." It then advised the jury:

Before arriving at your verdict, you are to consider all of the evidence of the case. You are to consider all of the evidence that is favorable to the defendant as well as all of the evidence which is unfavorable to him. *Moreover, your verdict, whatever it may be, must be the unanimous verdict of all 12 members of the jury.*

*Now, as I said, your verdict has to be unanimous, that is, all of you must agree upon the verdict returned by your foreman.* If any one of you disagrees with the findings of your fellow jurors, it is your duty to maintain your position until convinced that you are incorrect. You should not agree to a verdict merely because the majority of your fellow jurors vote in a certain way or merely to assume unanimity. By this, I do not mean that you should not consider and weigh the views and opinions of your fellow jurors with regard to the evidence you heard in making up your mind, arriving at your own judgment. You should listen to and consider the views and opinions of your fellow jurors, but after you have done this and arrived at a verdict in your own mind, you should not recede from or abandon your independent judgment simply for the purpose of reaching a compromised verdict. (Emphasis added) [3]

The petitioner argues that, by so instructing the jury, the trial court "indicated that a unanimous verdict was the sole method of terminating the deliberations" and, therefore, that the court's refusal to propound his proposed instruction was reversible error. This is so, he says, because of the "recent trend" of this Court to require that the jury be instructed as to all possible outcomes. He cites, *e.g., Hook*

---

3. The second paragraph of the questioned portions of the court's instruction is a modified *Allen* charge, *see Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), *Burnette v. State,* 280 Md. 88, 371 A.2d 663 (1977), the purpose of which is to break any potential deadlock in the jurors' deliberations.

*v. State,* 315 Md. 25, 553 A.2d 233 (1989); *State v. Hutchinson,* 287 Md. 198, 411 A.2d 1035 (1980). Relying on *Burnette v. State,* 280 Md. 88, 371 A.2d 663 (1977), he maintains that "telling a jury (as in the instant case) that unanimity is the only way to end the deliberations is very likely to have a coercive impact." The petitioner also relies upon cases from other jurisdictions. *See, e.g., Whalen v. State,* 492 A.2d 552 (Del.1985); *State v. Loyd,* 459 So.2d 498 (La.1984); *State v. Williams,* 392 So.2d 619 (La.1980); *State v. Bey,* 112 N.J. 123, 548 A.2d 887 (1988); *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188 (1987).

The majority counters, in Part II of its opinion, by pointing out that, in *Calhoun v. State,* 297 Md. 563, 593–95, 468 A.2d 45, 58–60 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984), "this Court has already rejected the notion that a trial judge must instruct the jurors in a capital sentencing proceeding prior to its deliberation that if they cannot agree on sentencing within a reasonable time a life sentence would be imposed." [Op. at 642–43.] In that case, we interpreted the 1982 version of § 413(k)(2) as an instruction to the trial court, to whom, we held, was entrusted, as in traditional trials, the determination when deliberations have continued for a reasonable time and, hence, whether a jury is truly hung, *i.e.,* in the context of a sentencing proceeding, unable to arrive at a decision as to the appropriate sentence. *Calhoun* was most recently followed in *Booth v. State,* 327 Md. 142, 608 A.2d 162 (1992).

*Booth* involved a similar, though not identical, issue. There, the petitioner's argument concerning the inappropriateness of refusing to instruct the jury consistent with former § 413(k)(2) was coupled with his misgivings concerning the coercive impact of an *Allen* type charge, given in supplemental instructions, to break an announced jury deadlock on a threshold determination, which, by rule and statute, was required to be made unanimously. The majority reiterated the conclusion previously reached in *Calhoun* and held that whether the jury was hung on the threshold issue, in that case, principalship, and whether mistrial

should have been declared, and a life sentence imposed, were issues for the trial court alone to decide. *Id.* at 157, 608 A.2d at 169. The majority also held that the modified *Allen* charge that the trial court gave over the petitioner's objection was not coercive and was not rendered so simply because the proceeding involved a potential capital sentencing. *Id.* at 159, 608 A.2d at 170.

I dissented in that case. For essentially the same reasons, I dissent in this case as well.

I acknowledge that *Calhoun* stands for the proposition that when to declare a mistrial is a matter addressed to the trial court and, further, the jury need not be told of the effect of its failure to agree. Nevertheless, as I pointed out in *Booth,*

> [t]his does not, and can not mean, however, that § 413(k)(2) has no role to play in connection with the various determinations that must be made during the sentencing proceeding. Simply because § 413(k)(2) is addressed to the trial court, and not the jury, and the jury, therefore, is never instructed as to its content or operation, does not mean that the sentencing proceeding may be treated as if unanimity were a prerequisite of a valid outcome; that up to, and until the trial court finally determines that the jury is hung, the jury not only need not be told of the effect of a failure to agree but actually may be misled into believing that it *must* agree one way or the other.
>
> The jury's inability to agree unanimously, one way or the other, as to sentencing in a capital case tried in this State, former § 413(k)(2) makes clear, necessarily results in imposition of a life sentence. To treat the sentencing procedure, including its component parts, as if unanimity were an absolute prerequisite, notwithstanding former § 413(k)(2), and to so instruct the jury is actively to mislead it.... [W]hile unanimity is required for the *jury to render a verdict,* the law recognizes and thus contemplates that *the jury* may not render a verdict. Thus, although by its terms, [a section] of the sentencing form

seeks unanimity, in point of fact, unanimity is not absolutely required. That section is only a component part of the verdict; therefore, to the extent that a reasonable time for deliberations has passed, ... the lack of unanimity must result in the imposition of a life sentence. Giving a modified *Allen* charge, the only purpose of which is to break a deadlock, is a clear statement to the jury that unanimity *must* be achieved. That is clearly not the case.

327 Md. at 210–211, 608 A.2d at 195–96.

I continue to adhere to those views. In this case, the modified *Allen* charge was given immediately after the reiteration that a verdict must be unanimous, thus conveying the very clear message to the jury that it must agree unanimously. Here, just as in *Booth*, that not only was totally inaccurate, it was, and is, actually misleading.